Bell, Bradley, Gebhardt & DeLaney, Charlotte, N. C., Bruce Gebhardt and Ernest S. DeLaney, Jr., Charlotte, N. C., on the brief, for plaintiff.

Charles K. Rice, Asst. Atty. Gen., James P. Garland, Phillip R. Miller, Jerome S. Hertz, Attys., Dept. of Justice, Washington, D. C., James M. Baley, Jr., U. S. Atty., Asheville, N. C., John E. McDonald, Jr., Asst. U. S. Atty., Charlotte, N. C., for defendant.

**ESTATE of J. Luther SNYDER, George C. Snyder and American Trust Company, Executors, Plaintiff,**

**v.**

**UNITED STATES of America, Defendant.**

**Civ. A. No. 1368.**

United States District Court
W. D. North Carolina,
Charlotte Division.

March 15, 1960.

WARLICK, District Judge.

Plaintiffs, George C. Snyder and the American Trust Company, co-executors of the estate of the late J. Luther Snyder, bring this action seeking to recover a refund of federal gift taxes paid in the amount of $62,265.74, together with interest in the sum of $7,186.37. The hearing was had before the Court without a jury.

On December 2, 1954, J. Luther Snyder made gifts of stocks and cash, under the terms of a very elaborate trust instrument, for the benefit of his children and grandchildren. One hundred thirty-two shares of the Charlotte Coca Cola Bottling Company stock, valued by him at $3,000 per share, were among the gifts made under the trust instrument and a return thereof was made. When the gift tax return was audited and all of the facts relating to the value of the gifts became known, it was the deter-

---

5. 48 App.D.C. at page 103.

mination of the Internal Revenue Service that the fair market value of this stock on December 2, 1954, was $4,620 per share.. Thereafter the gift tax deficiency plus accrued interest, both as sought to be recovered herein, was assessed, subsequently paid, claim for refund filed, and upon its rejection, this action was instituted in due time.

The only question in issue being the valuation of the one hundred thirty-two shares of stock of the Charlotte Coca Cola Bottling Company which was the subject of the gift made on December 2, 1954.

The Charlotte Coca Cola Bottling Company was incorporated in 1902, and has been continuously operated since such date. It owns and operates plants at Charlotte, Shelby and Concord, North Carolina,—serving an area under its franchise of Mecklenburg, Cleveland, Cabarrus and parts of Gaston counties, in North Carolina. Its product has at all times been bottled Coca Cola.

On December 2, 1954, the date of the gift, J. Luther Snyder and his close family owned in excess of two thirds of the outstanding capital stock of said company. There were seven hundred shares of outstanding stock on the date of the gift. All of said shares were common stock. Up until 1952 the stock books reflected as outstanding seven hundred twenty shares. During some time in 1952 twenty shares of said stock were redeemed by the company from the estate of a deceased stockholder, at a price of $4,000 per share, totalling $80,000, and the stock, on redemption, was cancelled. This sale, however, seems to have been in keeping with an understanding with respect to redemption had among the stockholders over the years. Other than this sale, there had been no sales of stock for the past fifteen years or more.

Originally the Charlotte company had a franchise area which covered more than five counties in North Carolina, which it had received from the parent company, the Coca Cola Manufacturing Company. However, many years prior to 1954 the Charlotte company sub-leased parts of its territory to other corporations on perpetual written leases under the terms of which the sub-leased territories would revert to the parent company at Charlotte in°the event the sub-lessee should fail or thereafter not live up to the terms of the general franchise held by the Charlotte company. Under these leases it received regular rent from Coca Cola Bottling companies located in Monroe and Lincolnton, North Carolina.

It also owned 10% of stock of the Coca Cola Bottling companies located at Gastonia and Salisbury, North Carolina, and during the preceding ten years prior to the gift of stock herein the Charlotte company received from these two companies cash dividends which increased periodically from $2,700 in 1945 to $7,200 in 1950, and $15,300 in 1954.

George C. Snyder, one of the children of the deceased taxpayer, is one of the Charlotte company's stockholders and has been employed by the company for approximately thirty-two years. He has been General Manager of said company since 1940 and has been its President since 1957.

The Charlotte company has always operated under a perpetual and exclusive bottling franchise issued by the Coca Cola Manufacturing Company and under the terms of its franchise purchases its coca cola syrup from the parent corporation, mixing its syrup with the necessary ingredients and then on bottling, sells its finished product. Its exclusive franchise extends further to Coca Cola sold in cup vending machines in which the syrup and all the necessary ingredients are mixed before being put into the machine.

The Charlotte company has always been a solvent institution, managed since its inception by the guiding genius of the late J. Luther Snyder, and has had a good earning position throughout its more than one half century of operation. Following the depression of the thirties, and up until the sugar rationing period of World War II, its earnings increased steadily and effectively. During the war

obviously its production was cut back because of sugar rationing. Following the end of the war, and being without any material competition from vending machines, its sales soared and the per capita consumption in the Charlotte area reached the astronomical figure of 196.7 bottles per year as compared with 28.5 for the New York area and 35.3 for the Los Angeles area.

For the five years next preceding the gift of the one hundred thirty-two shares of stock on December 2, 1954, the following table very clearly and cogently sets out the financial position of the Charlotte company.

| Year ending Nov. 30 | Net Earnings After Taxes | Dividends | Surplus | Gross Sales |
|---|---|---|---|---|
| 1950 | $419,347.11 | $288,000 | $1,497,423.61 | $2,564,649.20 |
| 1951 | 336,717.21 | 316,800 | 1,517,340.82 | 2,539,876.60 |
| 1952 | 308,521.90 | 271,700 | 1,476,067.05 | 2,490,181.73 |
| 1953 | 299,321.80 | 280,000 | 1,495,388.85 | 2,471,840.74 |
| 1954 | 250,826.43 | 245,000 | 1,501,215.28 | 2,322,206.55 |

During these same years, the Charlotte company had no bonded indebtedness.

Its balance sheets reflected net cost of assets after allowances for depreciation, investments (the stock of the two previously mentioned sublessee bottling companies) and cash as follows:

| Year | Remaining Book Cost of Depreciable Property | Investments | Cash |
|---|---|---|---|
| 1950 | $744,496.25 | $329,020.00 | $532,353.22 |
| 1951 | 674,223.26 | 478,800.00 | 550,434.76 |
| 1952 | 747,466.49 | 454,940.00 | 288,971.59 |
| 1953 | 691,746.66 | 492,340.00 | 442,833.20 |
| 1954 | 791,887.92 | 401,320.00 | 365,534.02 |

Its key asset, the operating franchise issued to it in 1902 under a perpetual franchise, from the parent corporation, was carried on its books and sales sheets at the nominal cost of $3. Even so it was stipulated in the evidence that the books reflected total and per share worth for those five years as follows:

| Year | Total | Per Share |
|---|---|---|
| 1950 | $1,569,423.61 | $2,179.76 |
| 1951 | 1,589,340.82 | 2,207.41 |
| 1952 | 1,546,067.05 | 2,208.66 |
| 1953 | 1,565,388.85 | 2,236.26 |
| 1954 | 1,571,215.28 | 2,245.93 |

On December 2, 1954, the Charlotte company had not raised its long-standing fixed wholesale prices to its jobbers, and retailers, and this in the face of increased cost of operation and general price increases, in other fields; though the nation-wide trend was toward the raising of wholesale prices and such must have appeared inevitable, and of course has subsequently come about.

It was also generally known in December 1954 that the parent company in Atlanta, from which the franchise to Charlotte was granted, was developing a premixed cup vending machine for use by

bottlers to compete with the other vending machines then on the market, all in an effort to meet increased competition from Pepsi-Cola and other drinks manufactured and sold, competitively with bottled Coca Cola.

In 1954 the two nearby sub-leased bottling companies, each built modern new plants which the Court finds came from expanded business operation, and during the same period the Charlotte company, in view of its confidence of the expanding business of the Charlotte area, expended in excess of $100,000 by adding to its plant facilities.

The labor situation in Charlotte during all of this period was on a relatively low base cost and in consideration of all of the factors set out herein, together with the unusual population increase in the Charlotte area, net profits after taxes were in excess of 10% of its gross sales.

The applicable statute under which the answers to the questions involved must be made is Section 1005 of the Internal Revenue Code of 1939, 26 U.S.C. § 1005, 1952 Ed. Therein it is set out:

"If the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift."

We commonly speak of the term "value" as it is used in the statute in the sense of a fair market value, in which it is defined as the price at which the property would change hands between a willing buyer and a willing seller, neither of whom is under any compulsion to buy or to sell and both of whom are reasonably well informed as to the facts having a bearing on value. Bader v. United States, D.C., 172 F.Supp. 833. In re Williams' Estate, 9. Cir., 256 F.2d 217.

The Commissioner of Internal Revenue in A Revenue Ruling 59–60 (Paragraphs 160, 119), sets out the following as factors to consider in estimating the value of closely held stocks and incidentally those likewise which are not offered on the market or across the counter.

(a) The nature of the business and the history of the enterprise from its inception.

(b) The economic outlook in general and the condition and outlook of the specific industry in particular.

(c) The book value of the stock and the financial condition of the business.

(d) The earning capacity of the company.

(e) The dividend-paying capacity.

(f) Whether or not the enterprise has goodwill or other intangible value.

(g) Sales of the stock and the size of the block of stock to be valued.

(h) The market price of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter.

Naturally of course there are many methods used in valuing property and it would appear reasonable that every known factor tending to shed light on the values to be ascertained is relevant. It would seem that the witnesses for the respective parties in this case have basically used the same method for placing a value on the stock in question. This method I learned from the evidence, is known as the capitalization of earnings method. It consists in essence, of selecting a representative earnings figure and applying to such earnings figure a proper rate of capitalization. The dispute here concerns what earnings figure should be used and what is the proper rate of capitalization. It would seem that having travelled this far together, the parties then left the company of each other.

The plaintiff offered the testimony of two expert witnesses, though the testimony of one was based entirely on the facts submitted to him by the other. Mr. H. L. McAllister, Senior Vice President of the R. S. Dickson Company, a reputable investment banking institution, and Mr. William B. Phillips of the underwriting department of the same company

placed a valuation figure of $2,848.64 upon each of the one hundred thirty-two shares of stock. The government tendered Mr. A. H. Meuche who was employed by the Internal Revenue Service as a valuation engineer and under his medium of determination it was his judgment that the stock had a value on the gift date of $5,653.56 per share. Plaintiff's expert witnesses in arriving at the valuation set by them as is shown, used for comparison the Coca Cola Bottling Company of Los Angeles, the Coca Cola Bottling Company of New York, and the Pepsi-Cola General Bottling Company, being three of the seven companies whose financial position, earnings, etc., were used for such comparison purposes. In their estimation of value they each took into consideration the nature of the business, its past record and history, earnings capacity, trend of earnings, book value, dividends paid, economic outlook of the business, good will, marketability of the stock, size of the block of stock to be valued, majority and minority interest, and market price of stock companies in the same or similar business, plus the dollar price of stock in question, and using that yardstick, reached their basic conclusion of the stock's value. Much of this is rather difficult for the ordinary mind, not trained in business or economics, to fully absorb or appreciate, and some of the above factors used by the witnesses in their estimation would obviously not be applicable to this stock.

As is usual in the trial of matters where the evidence of experts is relied upon, a manifest difference of opinion invariably comes about. The government's expert made a somewhat similar application, but different in varying degrees, and used as his criteria for comparison the Coca Cola Bottling Companies of St. Louis, Cincinnati, and Chicago. Manifestly these companies, in his opinion, were more nearly comparable to the Charlotte Coca Cola Bottling Company's position, and using the formula, prescribed by the department, reached the valuation given.

A careful analysis of the evidence of the experts in this opinion, would in my thinking, be unnecessary, in so far as a determination of the facts is concerned, and would throw little further light on the question involved. The Internal Revenue Department in undertaking to effect a valuation of the stocks of the various Coca Cola companies, has for many years used the formula of finding the average earnings for the past five years and would then multiply such figure by ten—for that Coca Cola Companies have always stood more or less in a different position in the matter of stock valuation, since each is invariably a closely held business as was the Charlotte Coca Cola Bottling Company. And further wherein, like Charlotte, the franchise of each has invariably been carried on its books at a nominal figure.

I conclude therefore after a careful study of this valuation problem, that, as of December 2, 1954, the fair market value of the Charlotte Coca Cola Bottling Company stock was $4,150 per share. This capitalization of earnings as I compute it is arrived at by taking the average earnings per share of $461.33 of the Charlotte company for the five-year period of 1950–1954 inclusive, and multiplying this figure by a rate of capitalization factor of nine. The normal rate of capitalization factor of ten as used by the Commissioner of Internal Revenue is found to be a proper one when reduced by a penalty factor of 10%. This 10% penalty factor is used to properly reflect the high dollar price per share of Charlotte stock, the high per capita consumption rate, and the entire lack of an established market. Accordingly I find the value of the stock to be $4,150. Using this valuation the parties will agree upon the amount of recovery to be had by plaintiff, including interest, and pending such the cause is retained for further proceedings.

Counsel will submit decree.