**ESTATE of J. Luther SNYDER, George C. Snyder and American Trust Company, Executors, Appellants,**

v.

**UNITED STATES of America, Appellee.**

**No. 8199.**

United States Court of Appeals Fourth Circuit.

Argued Nov. 22, 1960.

Decided Jan. 5, 1961.

Ernest S. Delaney, Jr., Charlotte, N. C. (Bell, Bradley, Gebhardt, Delaney & Millette, Charlotte, N. C., on the brief), for appellants.

Michael I. Smith, Atty., Dept. of Justice, Washington, D. C. (Howard A. Heffron, Acting Asst. Atty. Gen., Lee A. Jackson and Melva M. Graney, Attys., Dept. of Justice, Washington, D. C., and James M. Baley, Jr., U. S. Atty., Asheville, N. C., on the brief), for appellee.

Before SOPER, HAYNSWORTH and BOREMAN, Circuit Judges.

HAYNSWORTH, Circuit Judge.

The problem is one of valuation, for gift tax purposes, of a minority block of corporate stock without the aid of relevant sales.

Though the corporation had a substantial history of consistently declining sales and earnings, the Commissioner valued

the stock at ten times average annual earnings over a five-year period immediately preceding the date of the transfer. In this action for a refund of paid gift tax deficiencies, the District Court accepted the Commissioner's approach, but used a capitalization factor of nine, rather than ten, because of certain circumstances other than the established trend of sales and earnings.[1] No weight was attributed to the significant trend of sales and earnings, or to the cost and competitive conditions which caused it. Under the circumstances, we think the finding of value cannot be approved.

On December 2, 1954, J. Luther Snyder made gifts of 132 shares of the common stock of Charlotte Coca-Cola Bottling Company. These, with other gifts, were reported upon a gift tax return, the bottling company stock being valued at $3,000 a share. Subsequently, the Commissioner asserted a deficiency based upon a revaluation of the bottling company stock at $4,620.70 a share. Snyder paid the asserted deficiency of $62,265.74 in February 1957. After his death in March 1957, Snyder's executors paid the interest on the principal of the deficiency. A claim for refund having been disallowed, this action was commenced by the executors.

The bottling company, organized in 1902, had an exclusive and perpetual franchise to bottle Coca-Cola, and to sell the bottled product, in several counties in North Carolina. It had prospered, though there were times of vicissitude.

During the years of the Second World War, its sales and profits suffered from restricted production resulting from the rationing of sugar. When the sugar restrictions were lifted in 1947, however, its sales and profits soared to a peak for earnings of $497,544 in the fiscal year ending November 30, 1948. There then began a prolonged period of declining sales and earnings, but briefly interrupted by slight increases in 1950 over 1949. Earnings in 1954 were little more than half those in 1948, a little less than 60% of those in 1950. Gross sales and net earnings figures for the fiscal years 1947–1954 are set forth in the margin.[2]

Mr. George Snyder, the general manager of the Charlotte bottling company, explained the declining earnings. While his own costs were increasing, his sales were adversely affected by growing competition from other cold drinks and from coffee.

Pepsi-Cola introduced an improved product which it backed with effective merchandising and advertising programs. It offered its product in larger packages than the 6½ ounce bottle to which all Coca-Cola bottling companies were restricted.

Industrial plants, on the recommendations of safety engineers, began to exclude bottled drinks. The bottling company lost sales in such plants to vending machines dispensing Coca-Cola,[3] and other cold drinks, in cups.

Sales of bottled Coca-Cola were also being lost to coffee. Machines vending coffee in cups began to appear. He found from experience that when such a machine was placed near one of his previously located bottled Coca-Cola machines, the sales from his machine would be cut in half. Moreover, when stores, offices and factories were air-conditioned the old preference for cold drinks during hot weather was much less marked. With

1. 182 F.Supp. 71.

2. 

| Fiscal year ending November 30 | Sales | Net income after taxes |
|---|---|---|
| 1947 | $1,609,921 | $ 294,131 |
| 1948 | 2,656,260 | 497,544 |
| 1949 | 2,528,008 | 404,499 |
| 1950 | 2,564,649 | 419,347 |
| 1951 | 2,539,876 | 336,717 |
| 1952 | 2,490,181 | 308,426 |
| 1953 | 2,471,840 | 299,321 |
| 1954 | 2,322,206 | 250,826 |

3. The bottling company's franchise was limited to sales of Coca-Cola pre-mixed at its plant and packaged there in bottles or other containers. "Post-mixed" Coca-Cola, dispensed at lunch counters and in vending machines, was a competitor.

air conditioning, coffee could compete in hot weather as well as in cold.

These developments were not local to Charlotte. In varying degree, their impact must have been felt elsewhere. The record discloses, however, that Coca-Cola bottling companies in other areas were enjoying expanding sales and increasing earnings during the period when Charlotte was definitely on the decline. It is suggested that the explanation lies in the wide variation in per capita consumption. In 1954, Charlotte's sales [4] amounted to 196.7 Coca-Colas per capita per year, as compared to 35.3 in the franchise area of the Los Angeles company and 28.5 in New York. Its relatively greater success in the past meant that it contributed proportionately more to the expanding sales of competing products and there were fewer new potential consumers to be won by vigorous advertising and promotional campaigns. Nevertheless, it increased its advertising budget from $72,000 in 1950 to $111,-000 in 1954, without, however, stemming the decline in sales.

Mr. Snyder testified that in December 1954 he anticipated still lower sales and earnings. He knew of no prospective development which might be calculated to reverse the well-established trend.

The United States points to two things which, it suggests, made the prospect in December 1954 more hopeful than Mr. Snyder's appraisal of it.

First, it is suggested that Charlotte could have increased its prices. Mr. Snyder apparently thought an increase in prices, at some time, inevitable. It was quite impractical in December 1954, he testified, for he, with other bottlers, was then vigorously opposing a proposal for a North Carolina tax on soft drinks which would break the traditional retail price of five cents. He thought any increase in retail prices, whether resulting from taxation or increases in his wholesale prices, would have seriously adverse effect upon his unit sales, particularly in the light of competition from other products with which he was contending. Indeed, in the absence of the threatened taxation, no one could reasonably have supposed that prices could be increased without lending new impetus to the continuing loss of unit sales.

In April 1956, Charlotte did place in effect a 20% increase in its wholesale prices. Mr. Snyder testified that the price increase resulted in the anticipated loss of unit sales. Unexpectedly, permission had also been received to offer Coca-Cola in larger bottles competitive with Pepsi-Cola packages. While unit sales were off in 1956, gross sales rose from approximately $2,300,000 in 1955 to $2,500,000 in 1956, while earnings after taxes rose from $216,000, to which they had fallen in 1955, to $245,000 in 1956. In 1957, the first full year in which the increased prices were in effect, earnings fell off to $242,000 and in 1958 to $227,000.

While the price increase and the larger packages improved earnings, it did not lift them to the 1954 level or reverse the declining trend.

Secondly, the United States suggests that it was known in December 1954 that the Coca-Cola company was working on a machine to vend "pre-mixed" Coca-Cola with which bottling companies might compete with "post-mixed" Coca-Cola and other cold drink machines in plants where bottles were not allowed. Mr. Snyder testified that, in December 1954, he was not enthusiastic about the prospect of "pre-mixed" machines. He was informed they would be very expensive, and he entertained no hope that they would solve all of his problems.

The Charlotte bottling company did acquire some of the "pre-mixed" machines in November 1955. Mr. Snyder testified that they had proved to be a "losing business" which "hasn't been successful at all."

Both of the developments which the United States contends should have made the picture in 1954 brighter than painted by Snyder had eventuated prior to the

---

4. These figures do not include sales by others of "post-mixed" Coca-Cola.

trial. In combination, they had not lifted earnings to those of 1954 and the declining trend was still apparent. The subsequent performance of the company fully vindicates Snyder's pessimistic outlook in 1954.

Mr. H. L. McAllister, chairman of the Executive Committee and Senior Vice President of R. S. Dickson & Company, an investment banking house, testified as an expert for the plaintiff. He testified in detail about his consideration of all relevant matters, his approach being consistent with that prescribed by the Commissioner in Rev.Rul. 54–57.[5] He had data about certain other bottling companies which he thought reasonably comparable, but he thought their price-earnings ratios should be discounted because of the declining trend of Charlotte's sales and earnings, the high dollar value per share of its stock and the absence of any market for it. He concluded that the stock was reasonably worth $2,848.64 per share in December 1954, a figure at which he arrived by applying a capitalization factor of 7.95 to 1954 earnings.[6]

Mr. William B. Phillips, an analyst in the underwriting department of R. S. Dickson & Company, also testified, supporting McAllister's valuation.

Mr. A. H. Meuche, a valuation engineer for the Internal Revenue Service, testified for the United States. He started by finding a weighted average of the earnings per share of the Charlotte company for the five years 1950–1954. His average was weighted in favor of the later years by multiplying the fifth or last year's earnings by five, the preceding year's by four, the third year's by three, the second's by two and the first's by one, and dividing the total of his products by fifteen. This computation produced a weighted average earnings figure per share of $425.72. This compares with an unweighted average, using Mr. Meuche's figures, of $461.36 and actual 1954 earnings of $358.32.

To his weighted average earnings figures, Mr. Meuche applied a variety of price-earnings ratios with resulting indicated values per share of the Charlotte stock ranging from $2,244.59 to more than $12,000.00. He testified that he thought the Charlotte stock worth at least $5,200 per share, a figure he obtained by using a capitalization factor of 12.22, the ratio between the December 2, 1954 price of the stock of Seven-Up Bottling Co. of St. Louis to the weighted average earnings of that company for the five year period ending in the middle of 1954. That company was on a calendar year basis, and he did not use 1954 earnings upon the assumption they would not have been known in December of that year.

The earnings of Seven-Up of St. Louis jumped from $.63 a share in 1953 to $1.51 a share in 1954, a fact which hardly could have been generally unpredictable so late in the year as December. Its 1954 price-earnings ratio was 6.71, which if applied to Charlotte's 1954 earnings would give an indicated value for the Charlotte stock of $2,404.33.

Mr. Meuche did not approve the use of straight average earnings figures. He thought the figures should be weighted in favor of more recent years. He also testified that had he known that, in the informed judgment of management in December 1954, earnings in subsequent years would be less than in 1954 he would have used 1954 earnings or some lower figure.

Despite apparent agreement among the witnesses that a straight average of annual earnings was an inappropriate base for calculations in this case, the District Court found it unnecessary to analyze their testimony. He based his decision upon a finding that the Commissioner had adopted a special formula for valuing stocks of Coca-Cola companies—ten times

---

5. Cum.Bul. 1954–1 page 187 et seq.

6. There were 700 shares outstanding. 1954 earnings of $250,826.43 were equivalent to $358.32 per share. 7.95 times $358.32 resulted in a valuation of $2,848.-64 per share.

average annual earnings over a five year period.[7] He said:

"A careful analysis of the evidence of the experts in this opinion, would in my thinking, be unnecessary, in so far as a determination of the facts is concerned, and would throw little further light on the question involved. The Internal Revenue Department in undertaking to effect a valuation of the stocks of the various Coca-Cola companies, has for many years used the formula of finding the average earnings for the past five years and would then multiply such figure by ten—for that Coca Cola Companies have always stood more or less in a different position in the matter of stock valuation, since each is invariably a closely held business as was the Charlotte Coca Cola Bottling Company. And further wherein, like Charlotte, the franchise of each has invariably been carried on its books at a nominal figure.

"I conclude therefore after a careful study of this valuation problem, that, as of December 2, 1954, the fair market value of the Charlotte Coca Cola Bottling Company stock was $4,150 per share. This capitalization of earnings as I compute it is arrived at by taking the average earnings per share of $461.33 of the Charlotte company for the five-year period of 1950–1954 inclusive, and multiplying this figure by a rate of capitalization factor of nine. The normal rate of capitalization factor of ten as used by the Commissioner of Internal Revenue is found to be a proper one when reduced by a penalty factor of 10%. This 10% penalty factor is used to properly reflect the high dollar price per share of Charlotte stock, the high per capita consumption rate, and the entire lack of an established market. Accordingly I find the value of the stock to be $4,150. * * * "

In Worcester County Trust Co. v. Commissioner, 1 Cir., 134 F.2d 578, 581, the court reviewed a finding of the Board of Tax Appeals sustaining a determination by the Commissioner that the stock was worth ten times average earnings. The court said:

"Turning to the Board's opinion it seems to us clear that in spite of what it said with respect to the impropriety of using a multiple of average earnings as the basis for a finding of fair market value, without knowledge of the setting in which the earnings appear, that in fact is exactly what the Board did. There being no evidence anywhere in the record to indicate that the stock was worth $35 per share, except that $35 per share is the valuation arrived at by multiplying the average earnings of the Company over the five year period from 1933 to 1937 by ten, we must conclude that the Board followed the Commissioner in doing just that. There is no other rational explanation for its result.

"In view of the facts found by the Board and stipulated by the parties we believe that this valuation is arbitrary and excessive."

█ Closely held corporate stock cannot be valued reasonably by the application of any inflexible formula. One tailored to the particular case must be found, and that can be done only after a discriminating consideration of all information bearing upon an enlightened prediction of the future.

█ Financial data is important only to the extent it furnishes a basis for an informed judgment of the future performance of the particular company, for investors buy stock of this kind out of reasoned hope in the future, not out of pride in the past. Specific data may be determinative in one case, but quite immaterial in another. If a corporation is about to go into liquidation, the entire answer may be found in liquidating

---

7. We find no basis in the record for this finding. It appears to be inconsistent with Rev.Rul. 54–57.

values, data which the parties here have properly ignored, for there is no reasonable prospect that the Charlotte company will be liquidated.[8] The use of relevant data must vary with other circumstances. As the Government witness, Meuche, observed, two companies may have had average annual earnings of $300,000 over a five year period, but the earnings of one may have been only $100,000 in the first year increasing in $100,000 steps to $500,000 in the fifth, while the earnings of the other company may have retrogressed from $500,000 to $100,000 in $100,000 steps. While the two companies had the same average earnings during the five year period, this data suggests their present and potential earnings capacities may be quite dissimilar. Though appropriate note be taken of observable trends in financial data, they form an unsafe platform for a prediction of the future until illuminated by their setting, including an appraisal of the forces responsible for the trends and the forces which may be expected to operate upon them in the future.

A prudent investor, searching for a basis for a reasonable estimate of the future, does not depend upon averages alone. He searches for significant trends, and his use of data that measures past performance must be governed by all of those considerations which enter into managerial projections of sales and earnings.

Here there was a clearly defined trend to lower earnings. There was reason for it. With rising costs of production and distribution, there were competitive conditions which had caused a persistent decline in sales. There was no reason to suppose those conditions would disappear or that the competitors would compete less effectively in the future. Any informed investor must have reasoned, as Mr. Snyder did, that the trend to lower earnings would continue, as it did in fact.

Under these circumstances any computation which presupposes future earnings at levels substantially higher than those realized in 1954 is neither realistic nor reasonable. Nor should 1954 earnings be projected into the future without adjustments to the capitalization factor to give effect to the probability of continuation of the decline in earnings.

■ Because the District Court did not attribute any effect to these material considerations, the judgment must be reversed. We think there need not be a new trial, however, for, giving effect to these considerations, we think a reasonable valuation could not exceed the $3,000 per share at which they were returned by the donor-taxpayer.[9]

The judgment will be reversed and the cause remanded for the entry of judgment for the plaintiffs in accordance with this opinion.

Reversed and remanded.

8. On November 30, 1954, the stock had a book value of $2,245.93 per share. Even after their extended decline, earnings were still sufficiently high that no one appears to have contemplated liquidation. Were this an investment company, of course, the value of the underlying assets would be important.

9. This is the equivalent of 1954 earnings multiplied by 8.37. Witnesses for the taxpayer used a factor of 7.95. Mr. Meuche, for the Government, used a number of factors, some of them lower and some of them higher. Those higher than 8.37 require discounting to reflect the relatively unfavorable conditions in Charlotte.