Inga Bardahl v. Commissioner. Ole Bardahl v. Commissioner.
Bardahl v. Commissioner
Docket Nos. 1823-63 and 1824-63.
United States Tax Court
T.C. Memo 1965-158; 1965 Tax Ct. Memo LEXIS 172; 24 T.C.M. (CCH) 841; T.C.M. (RIA) 65158; June 15, 1965
Robert O. Beresford and Robert W. McKisson, for the petitioners. Richard H. M. Hickok, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in the gift tax of each of petitioners for the year 1959 in the amount of $12,795. The only issue for decision is the fair market value on December 30, 1959, of 2,860 shares of capital stock of the Bardahl manufacturing Company. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, residing in Seattle, Washington, each filed a gift tax return for *173 the year 1959 with the district director of internal revenue at Tacoma, Washington. On each return there was the consent of spouse to have the gifts made by either spouse to third parties during the calendar year considered as having been made one-half by each. Each return reported gifts of 2,860 shares of stock taking credit for the one-half reported by the spouse. Sixty shares of stock were given to each of petitioners' two daughters and the balance was given to various trusts for petitioners' daughters and grandchildren. On each of the returns the stock was valued at $100 per share. The capital stock of Bardahl Manufacturing Corporation (hereinafter referred to as Manufacturing) is not regularly traded on any stock exchange, and there is no readily ascertainable market for the stock. As of December 30, 1959, immediately prior to the gift here involved, the outstanding capitalization of Manufacturing consisted of 20,000 shares of capital stock with a par value of $50 per share and the ownership of Manufacturing's stock was as follows: Number
Owner
of shares
Ole Bardahl
17,381 11/70
Inga Bardahl
20
Evelyn Bardahl Nicholiason
(daughter)
812 1/2
Lillian Bardahl Simpson (daughter)
812 1/2
Bardahl Manufacturing Corporation
Pension Plan
28 4/7
Bardahl Manufacturing Corporation
Profit Sharing Plan
28 4/7
*174 The balance of corporate stock was held by 24 other minority shareholders. The effect of the gift here involved on the above ownerships was to decrease petitioner Ole Bardahl's ownership to 14,521 11/70 shares and increase the ownerships of Evelyn Bardahl Nicholiason and Lillian Bardahl Simpson to 872 1/2 shares, respectively. The 2,860 shares of stock, the value of which is here in issue represents a minority interest of approximately 14 percent and these shares are not a controlling factor. Petitioners in the instant case and Manufacturing were the petitioners in a case before this Court in which a Memorandum Opinion was filed on October 20, 1960 (T.C. Memo. 1960-223). A copy of this Memorandum Opinion was received in evidence in this case. Many of the stipulated facts in the instant case are direct quotations from the Findings of Fact in that Memorandum Opinion. The findings set forth in that opinion bearing on the education, training, and business activities of petitioner Ole Bardahl, the method of operation of the distributors of Manufacturing, the amount of net income of Manufacturing for the years prior to 1955, and the salary paid to Ole Bardahl are incorporated herein *175 by this reference. Manufacturing was organized under the laws of the State of Washington in 1939 as the Pacific Products Company to engage in the manufacture and marketing of oil and grease additives. The corporate title was changed to Bardahl Manufacturing Corporation in 1948. During the first 3 years of operation, 1939-1941, sales and net income were nominal. For the period from 1942-1945, despite material shortages, allocations and restraints of a war economy, the company continued operations and produced sales of $39,318 in 1945. In 1946 Manufacturing embarked on a national advertising campaign, increasing sales to $68,211 in that year. Beginning in 1948 aggressive promotion of Manufacturing's products brought about a sharp upward trend in orders. By the year 1955 gross sales had risen to $1,236,093, and in 1959 reached a total of $2,348,389. Ole Bardahl actively participated in the oil additive business from 1939 until the present time and became president of Manufacturing in 1940 and has continued as a director and president of the corporation to date. Manufacturing's products grew from two products in 1939 to 11 in 1955 and remained the same through December 31, 1959. *176 All major phases of Manufacturing's operations were under the direct personal supervision of Ole Bardahl. The responsibility for making all decisions except those of nominal importance was his. When traveling either in the United States or abroad he kept in constant contact with Manufacturing's principal office and was frequently consulted as to matters of importance. His approval was required for all purchases costing more than a few hundred dollars. All arrangements for financing received his personal attention and required his approval. Market research was conducted under his direction and the choice of new products to be manufactured was his alone. In this he consulted with and directed operations of the lubricating engineer. He made the major decisions as to the work force, the hours of plant operation, the types of machinery to be purchased for plant operation, and products methods. He constantly sought to improve the control of the quality of the products and to increase the degree of automation in production. He directed sales and promotional activities; he encouraged and attracted establishment of distributorships all over the world; he personally visited the distributors, *177 advising them, consulting with them as to the demand for existing or new products, aiding them in more firmly establishing their business, even to the point of traveling with distributors' salesmen to counsel them in improved sales techniques. He also performed some services as a research chemist. The following actual sales of shares of Manufacturing's stock were made during the years 1956 through 1962: Number
of
Price Per
Shares
Transferor
Transferee
Date
Total Price
Share
195.3125
John Enebeck
Ole Bardahl
10/17/56
$7,500.00
$38,40
50
Ole Bardahl
Seattle-First
National Bank,
Trust Dept. as
Trustee of
Bardahl Pension
Plan and
Bardahl Profit
3/12/58
$3,736.00
$74.72
Sharing Plan
13
Richard G.
Simpson,
Trustee
Albert Langton
2/25/60
$ 715.00
$55.00
This sale represented accumulated fractional shares of a stock
dividend which was offered on December 31, 1959, to all
stockholders of record. The purchaser, Albert Langton was the
highest bidder.
40
N. Noritake
United Pacific
10/12/60
$2,400.00
$60.00
Corporation
50
N. Noritake
Merrill, Lynch,
Pierce, Fenner
& Smith, Inc.
Merrill Lynch
Pierce, Fenner &
Smith, Inc.
Nancy G. Fenton
2/27/61
$2,850.00
$57.00
The 50 shares were transferred by N. Noritake on February 3, 1961
to Merrill, Lynch, Pierce, Fenner & Smith, Inc., stockbrokers, who
in turn transferred to Nancy G. Fenton on March 22, 1961. Their
records show the transaction as occurring on February 27, 1961 at a
price of $57.00 per share.
28
Grace and
Herbert
Allen
Lillian M.
5/24/62
$2,114.00
$75.50
Simpson
*178 Bardahl International Corporation has the sole responsibility for the distribution and advertising of Manufacturing's products and the advertising programs are carried on in conjunction with independent distributors and the costs of some programs are split between Bardahl International Corporation and the independent distributors. Bardahl International Corporation, known on January 1, 1955, as Bardahl Oil Company of Washington, Inc., became the sole sales organization and distributor of Manufacturing in accordance with the terms of a contract entered into between the two corporations effective as of January 1, 1955. On July 28, 1959, the distributorship contract between Georgio Geddes and Bardahl International Corporation which provided for the distributorship of Manufacturing's products throughout Europe, South America, and Asia was cancelled. The sales of Manufacturing's products through Bardahl International Corporation to Geddes constituted approximately 10 percent of the total operations of Manufacturing. During the calendar years 1955 through 1959 Manufacturing had gross income, deductions, net income, and net income after taxes as follows: 1955
1956
1957
1958
1959
Gross income
$720,974.42
$700,207.03
$853,785.34
$1,260,095.74
$1,411,565.20
Less
264,768.00
297,425.08
328,949.55
501,483.07
469,876.21
deductions
Net income
$456,206.42
$402,781.95
$524,835.79
$ 758,612.67
$ 941,688.99
Net income
$224,732.27
$198,925.46
$258,387.76
$ 369,755.16
$ 458,225.00
after taxes
*179 During the years 1955 through 1959 Manufacturing paid cash dividends in the following amounts: Cash
Total
dividends
Capital
dollar
per
shares
amount of
Year
share
outstanding
dividends
1955
$3.00
10,000
$ 30,000
1956
4.00
12,500
50,000
1957
$2.00
15,000
$ 30,000
1958
1.00
17,500
17,500
1959
5.00
20,000
100,000
In addition to cash dividends Manufacturing declared stock dividends as follows: Total number
of shares
Earnings
Stock
issued
capitalized
dividends
as stock
through stock
Year
declared
dividend
Par value
dividends
1955
25%
2,500
$50.00
$125,000
1956
20%
2,500
50.00
125,000
1957
16 2/3%
2,500
50.00
125,000
1958
14.285%
2,500
50.00
125,000
1959
12 1/2%
2,500
50.00
125,000
The net tangible book assets of Manufacturing at December 31, 1959, were $1,890,527.39. On the basis of the 20,000 shares of capital stock outstanding on December 31, 1959 Manufacturing's earnings per share for the years 1955 through 1960 were as follows: Earnings per
Year
share
1955
$11.24
1956
9.95
1957
12.92
1958
18.49
1959
22.91
1960
3.95
*180 Hastings Manufacturing Company (hereinafter referred to as Hastings) is a corporation, the stock of which is listed on the American Stock Exchange. This corporation manufactures replacement piston rings and expanders, automotive oil and gasoline additives, spark plugs, oil filter cartridges, seat belts, and castings. Approximately 25 percent of Hastings' sales resulted from oil additives. The net tangible book assets of Hastings at December 31, 1959, were $6,862,050. Its net income after taxes for the year 1959 was $676,236. As of December 31, 1959, Hastings had outstanding 1,055,700 shares of common stock. The pershare earnings of Hastings on the basis of the number of shares it had outstanding on December 31, 1959, for the years 1955 through 1960 were as follows: Per-share earnings in
cents per
Year
share
1955
48
1956
21
1957
28
1958
49
1959
64
1960
58 For the third quarter of 1959 Hastings' earnings were 18 cents per share as compared to 20 cents per share for the same quarter of 1958 and for the fourth quarter of 1959 were 7 cents per share as compared to 11 cents per share for the fourth quarter of 1958. The average market price of Hastings' *181 stock on December 31, 1959, was $6,0625 per share. Shaler Company (hereinafter referred to as Shaler) is a corporation, the stock of which is traded over the counter. It manufactures and distributes in the United States and Canada high power motor oil additives, engine carbon removing compound, a lubricating product for locks, hinegs and for correcting friction noise in automobile bodies, "Hot Patches" for repair of tires, and a full line of repair materials, supplies and equipment for repair of both tubed and tubeless tires. As of December 31, 1959 Shaler had 99,849 shares of common stock outstanding. The net tangible book assets of Shaler at December 31, 1959, were $2,138,765. The net income after taxes for the year 1959 was $209,775. During the years 1955 through 1960 the net income per share after taxes of Shaler, based on the number of shares outstanding on December 31, 1959, was as follows: Net income per
share after
Year
taxes
1955
$2.37
1956
.89
1957
1.68
1958
1.59
1959
2.10
1960
.59 A bid price for Shaler's stock on December 30, 1959, was $15.25 per share. Respondent in his notice of deficiency determined that the fair market value of *182 the stock of Bardahl Manufacturing Company as of December 30, 1959, was $140 per share, stating that his determination was predicated upon all "relevant factors and consideration of fair market value." Ultimate Fact The fair market value of the stock of Bardahl Manufacturing Company as of December 30, 1959, was not in excess of $100 per share. Opinion As both parties recognize, where a gift is made in property, the value thereof at the date of the gift is considered to be the amount of the gift under the provisions of section 2512 of the Internal Revenue Code of 1954.[1] Where the property being valued is stock and there are sales at or near the date of valuation in sufficient amounts and of such a nature as to indicate the fair market value of the stock, such sales are to be used in making such determinations. However, where selling prices or bid and asked prices are unavailable or the sales are not such as to be truly indicative of fair market value, all relevant factors are to be taken into consideration in the determination of fair market value. As we stated *183 in Mathilde B. Hooper, Administratrix, 41 B.T.A. 114, 129 (1940), "In the absence of sales, the material factors to be considered in determining the fair market value of the stock of a close corporation, * * * are: earning capacity and anticipated profits; book value; dividend yields; and such other facts and circumstances surrounding the corporation and its business as would be considered by a prospective buyer and seller." [2]
*184 The question of fair market value of stock in a closely held corporation where there are insufficient sales to be determinative of value is one of fact. The opinions of experts are helpful in reaching the necessary factual conclusions. In the instant case the testimony of a qualified expert for petitioner and of a qualified expert for respondent was offered in evidence by stipulation as to what would constitute the direct testimony of such witnesses were they called to testify. In addition petitioner's expert witness was called for cross examination. Respondent's expert witness, a valuation specialist with the Internal Revenue Service, concluded that the value of Manufacturing's stock on December 30, 1959, was $132 per share. This conclusion was based primarily on a determination of the 5-year weighted average of the earnings of Hastings and Shaler as compared to the December 30, 1959 price of the stock of each company or a so-called "price/earnings ratio." An average "price/earnings ratio" of 10.97 was determined for Hastings and Shaler. The computed weighted 5-year average per share earnings of Manufacturing for the years 1955 through 1959 of 17.23 was multiplied by this ratio *185 to arrive at a preliminary valuation of 189.01 for Manufacturing's stock. This witness concluded that because of the lack of marketability of Manufacturing's stock, the shares being closely held so that the average investor would consider the risk involved in a minority holding in such a "locked-in" investment, a 20 percent discount should be applied to the preliminary computed value. This discount was based on cost of flotation statistics complied by the Securities and Exchange Commission. The witness further concluded that a 10 percent discount should be applied to the preliminary value because Manufacturing was a low diversification manufacturer, its products being related in nature and usage, which fact increases the vulnerability to competition and creates a sensitivity to swings in the business cycle. Applying the 30 percent discount to the preliminary per share value of $189.01, the witness arrived at $132.31 which was rounded to $132 as his opinion of the fair market value of the stock on December 30, 1959. In arriving at his opinion the witness stated with respect to book value: In the securities evaluation of an industrial "going concern" (as opposed to one in liquidation), *186 the most reliable measure of the value of assets is found in the earnings statement. Over emphasis on book values as determinative of fair market value, can be misleading since the relationship between the two, varies so widely from company to company even within the same industry. However, book values can assume significance when coupled with income and when earnings are stated as a percentage of book values. In picking the comparables, Hastings and Shaler, the witness examined 20 manufacturers, but the majority of these were eliminated for various reasons including capital structure, size, lack of marketability, and dividend restrictions. Petitioners' expert witness, using the same comparative companies as respondent's witness, arrived at a preliminary valuation of $128.94 (which petitioners admit due to a mathematical error should be corrected to $137.23), which he discounted by 50 percent. This discount included the two items composing the 30 percent which respondent's witness used and assigned an additional 20 percent discount because of the one-man management of the corporation and the minority interest being valued. Applying this discount petitioners' expert witness arrived *187 at a December 30, 1959 valuation of $64.47 per share, which petitioners admit after mathematical correction should be $68,615 per share. Petitioners' witness was of the opinion that more weight should be given to the probable course of future earnings in the industry than was given to this factor by respondent's expert witness. Petitioners' expert witness pointed out that in the last half of 1959 Hasting's financial report showed a decline in each quarter over the comparable quarter in 1958. In his opinion upon the available information in the latter part of 1959 an informed investor would have sensed a decline looming ahead within the oil additive business. Such a decline did in fact materialize. Petitioners' expert witness was of the opinion that less consideration should be given to the "price/earnings ratio" of Hastings than to that of Shaler since only 25 percent of Hastings' sales were of oil additives and that its much greater diversification in 75 percent of its sales would render it far less comparable to Manufacturing than Shaler which is primarily in the oil additive business. Petitioners' expert witness also pointed out that Hastings' stock was in a low price range, its *188 1956 to 1959 average being 4.32 and stated that, "It is well known in the securities filed that low price stocks have a tendency to sell on a higher price/earnings ratio than do the higher priced shares." In arriving at a "price/earnings ratio" petitioners' witness excluded the year 1956 on the theory that this year was unusually low for Hastings, Shaler, and Manufacturing which suggests some abnormality. Petitioners' witness also computed the "price/earnings ratio" by use of the average 1956 through 1959 prices of Hastings and Shaler stock instead of the December 30, 1959 prices of these stocks. The "price/earnings ratio" at which petitioners' witness arrived to be applied to Manufacturing's weighted average earnings which he concluded to be 18.42, was 7.45. Respondent argues that the elimination of the year 1956 is unjustified, that the "price/earnings ratio" should be computed using the 5-year average earnings compared to sales price of the stock at December 30, 1959, and that the 20 percent discount which his expert allowed for lack of marketability is sufficient to cover any discount that might be necessary due to the fact that a minority interest was being purchased in a corporation *189 which had been managed primarily by one man. Respondent argues that the salary of $75,000 a year being paid to Ole Bardahl would hire a competent new manager and that Ole Bardahl's son-in-law had come into the corporation in 1957 as vice president in charge of sales to be trained to take on part of Ole Bardahl's responsibility. From the evidence it appears that the discount for lack of marketability arrived at by respondent's witness was on the basis of flotation costs and therefore would not consider any discount which might be necessary because of the one-man management of the corporation which the facts show existed. As petitioners' witness pointed out, some thought would be given by a prospective buyer as to the anticipated earnings as of December 30, 1959, and there would be some indication from available data that such earnings might be declining from the high point of the year 1959. We are unwilling to accept in total the conclusion of either expert witness, but have given consideration to the opinion of each and to the facts on which such opinion is based. We have also considered other factors including the dividend policy of the company and the per share net tangible *190 book asset value of the stock at December 30, 1959. Respondent in concluding his brief states: In short, the petitioners' witness testified that a willing seller would part with the subject stock at a price he could recover in approximately 33 month's earnings, after taxes, without any consideration for book value of the assets on December 30, 1959 which was $96.57 per share. This, the respondent submits, is incredible. In a going concern engaged in a manufacturing business, as distinguished from an investment company, liquidating value has little relevancy in determining fair market value. Snyder's Estate v. United States, 285 F. 2d 857 (C.A. 4, 1961). In a closely held corporation, where the transfer is of a minority interest, stocks may be inclined to have a fair market value less than book value since a minority stockholder is in no position to bring about dissolution to obtain the book value. See Central Trust Company v. United States, 305 F. 2d 393, 411 (Ct. Cls., 1962); and Drybrough v. United States, 208 F. Supp. 279 (W.D. Ky., 1962). Respondent's expert witness stated that "Historically, companies earning a low return on *191 invested capital tend to sell at a discount from asset value, whereas those that produce a high return often sell at a premium above asset value." Respondent's expert witness gave inadequate consideration to the future earnings prospects of Manufacturing's business. See Snyder's Estate v. United States, supra. These prospects would be affected by the business conditions in the oil additives business at the end of 1959 and by the fact that there was no proven efficient management of Manufacturing's operations should Ole Bardahl become incapable of running that business. Our conclusion is that the value placed on the stock by respondent's expert witness is too high and that placed on the stock by petitioners' expert is too low when all of the relevant factors are considered. However, since petitioners on their gift tax returns used a value of $100 per share and have not claimed an overpayment of gift tax, we do not have to determine a precise fair market value of the stock, but merely that, as we have found as an ultimate fact, the fair market value of the stock on December 30, 1959, was not in excess of $100 per share. Decision will be entered for petitioners. Footnotes
1. All references are to the Internal Revenue Code of 1954 unless otherwise specified. SEC. 2512. VALUATION OF GIFTS. (a) If the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift. ↩
2. Sec. 2031 with respect to the valuation of unlisted stocks and securities for estate tax purposes provides as follows: (b) Valuation of Unlisted Stock and Securities. - In the case of stock and securities of a corporation the value of which, by reason of their not being listed on an exchange and by reason of the absence of sales thereof, cannot be determined with reference to bid and asked prices or with reference to sales prices, the value thereof shall be determined by taking into consideration, in addition to all other factors, the value of stock or securities of corporations engaged in the same or a similar line of business which are listed on an exchange. Respondent's regulations with respect to valuation of such stock and securities for gift taxes provide as follows: Sec. 25.2512-2(f) (Gift Tax Regs.). Where selling prices or bid and asked prices are unavailable. If the provisions of paragraphs (b), (c), and (d) of this section are inapplicable because actual sale prices and bona fide bid and asked prices are lacking, then the fair market value is to be determined by taking the following factors into consideration: (1) In the case of corporate or other bonds, the soundness of the security, the interest yield, the date of maturity, and other relevant factors; and (2) In the case of shares of stock, the company's net worth, prospective earning power and dividend-paying capacity, and other relevant factors. Some of the "other relevant factors" referred to in subparagraphs (1) and (2) of this paragraph are: The goodwill of the business; the economic outlook in the particular industry; the company's position in the industry and its management; the degree of control of the business represented by the block of stock to be valued; and the values of securities of corporations engaged in the same or similar lines of business which are listed on a stock exchange. However, the weight to be accorded such comparisons or any other evidentiary factors considered in the determination of a value depends upon the facts of each case. * * *↩