ESTATE OF MARK S. GALLO, R. J. GALLO, ADMINISTRATOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Gallo v. Commissioner
Docket No. 24465-82.
United States Tax Court
T.C. Memo 1985-363; 1985 Tax Ct. Memo LEXIS 273; 50 T.C.M. (CCH) 470; T.C.M. (RIA) 85363; July 22, 1985. M. Bernard Aidinoff,Philip L. Graham, Jr.,Henry Christensen III,Paul J. Sax,William D. McKee, and Dean C. Berry, for the petitioner. Alan S. Beinhorn, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined a deficiency *274 of $347,871 in petitioner's Federal estate tax. The issue for decision is the date-of-death value of a certain minority interest in the common stock of a closely held corporation. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein. Mark S. Gallo (decedent) died on November 1, 1978 (the valuation date), at the age of 16 years. R. S. Gallo (petitioner), father of decedent and administrator of his estate, timely filed the Federal estate tax return with the Internal Revenue Service Center in Fresno, California. Decedent's gross estate included 1,178 shares of Class J common stock of Dry Creek Corporation (Dry Creek) held by three separate minority trusts, the assets of which were subject to decedent's powers of appointment. Petitioner reported the stock on decedent's estate tax return at a value of $290 per share or $341,620 in the aggregate and timely paid a tax of $77,583. In the notice of deficiency, respondent valued the stock at $1,043 per share or $1,228,654 in the aggregate. At the end of trial, the Court granted petitioner's oral motion to amend the petition to conform *275 to the evidence and to claim an overpayment. Overview of Dry Creek
Dry Creek was a Delaware corporation organized on December 19, 1973. On the valuation date, Dry Creek had outstanding both voting common stock and cumulative preferred stock. The common stock consisted of two classes, Class E and Class J, with an equal of number of shares of each class outstanding. Except for a small number of shares held by charity, descendants of Ernest Gallo (Ernest) owned all of the outstanding Class E common stock, with one-half being owned by the family of his son Joseph E. Gallo and one-half being owned by the family of his son David E. Gallo. Descendants of Julio Gallo (Julio) owned all of the outstanding Class J common stock, with one-half being owned by the family of his son, petitioner, and one-half being owned by the family of his daughter, Susann G. Coleman. No holder of Class J stock held Class E stock; no holder of Class E stock held Class J stock. The shares of Class J common stock includible in decedent's gross estate constituted less than 2 percent of the outstanding Class J common stock. The Board of Directors of Dry Creek consisted of six members, three elected by *276 majority vote of the outstanding Class E common stock and three elected by majority vote of the outstanding Class J common stock. The directors served for 3-year staggered terms, with the Class E shareholders and the Class J shareholders each electing one director each year. A majority vote of each class of directors was required for any action requiring a vote of directors. Other than the election of directors, any corporate action requiring a vote of the common shareholders required approval of a majority of both the Class E and Class J stockholders, voting separately. Common stock of Dry Creek had never been listed on an exchange or traded in any market. The only sales of Dry Creek common stock that have ever occurred were aggregate sales after the valuation date of 305 Class J shares held by two of the minority trusts for decedent to the third trust. As of the valuation date, no dividends had ever been declared or paid with respect to the common stock of Dry Creek. Dry Creek issued the preferred stock in connection with a recapitalization in 1976. Ernest and Julio owned substantially all of the preferred shares outstanding on the valuation date. The preferred stock was *277 entitled to a cumulative annual dividend of a fixed amount per share, which had been paid in full through the valuation date with respect to all outstanding preferred shares. Dry Creek generally could, at its option, redeem any portion of the preferred stock after January 1, 1982, at a predetermined price per share that varied slightly, depending upon the year of redemption. Under a sinking fund provision, Dry Creek was required to redeem for a fixed price per share any preferred shares held on or after January 1, 1984, by any owner other than a member of the Gallo family. Although the preferred stock generally did not possess voting rights, the holders of the preferred stock were entitled to elect two additional directors of Dry Creek, if either dividends on the preferred stock were in default in the amount of six quarterly dividends or Dry Creek failed to redeem shares as required in the sinking fund provision. Dry Creek maintained a policy against public disclosure of financial information. As of the valuation date, Dry Creek had never made available to the public financial information concerning Dry Creek or its subsidiaries. As of the valuation date, it had always been *278 and continued to be Dry Creek's policy to remain closely held by the Gallo family. No holders of the common stock intended to sell any of his or her shares to outsiders. Dry Creek was primarily a holding company and its principal asset was all of the stock of its wholly owned subsidiary, E. & J. Gallo Winery (Gallo), a California corporation. Any other assets or operations of Dry Creek did not materially affect the value of Dry Creek. Founded as a partnership in 1933 by Ernest and Julio, Gallo was the largest producer of wine in the United States as of the valuation date. Ernest and Julio made all policy decisions and actively managed Gallo. Ernest was chairman of the board of directors of both Dry Creek and Gallo and was responsible for sales, marketing, and distributor relations. Julio was president and a director of both Dry Creek and Gallo and was responsible for grower relations, winemaking, production, bottling, and shipping. The second generation of Gallo family members established careers with Dry Creek and Gallo and were active in management. Ernest's sons participated in his area of the business, and Julio's son and son-in-law participated in his area. Gallo had *279 three principal winemaking facilities in California -- one in Fresno, one in Livingston, and one adjacent to the corporate headquarters in Modesto. Gallo also owned all of the shares of Gallo Glass Company (Gallo Glass), a bottle manufacturer in Modesto. Gallo Glass sold all of its output to Gallo and satisfied all of Gallo's bottle needs. Gallo sold its products through independent distributors, with the exception of three distributorships in which Gallo had an interest, to retail outlets primarily in the United States and Canada. The U.S. Wine Industry
As part of the alcoholic beverage industry, the wine industry was a licensed industry subject to excise taxes. The Federal Government and each of the states regulated sales, methods of operation and production, recordkeeping, labeling, packaging, advertising, interstate shipments, and trade practices. The U.S. wine industry classified wine products in four principal categories: table wines, sparkling wines, dessert wines, and special natural wines. Table wines were unflavored wines containing not more than 14 percent alcohol by volume. Sparkling wines possessed natural carbonation and contained not more than 14 percent *280 alcohol. Dessert wines were unflavored wines containing more than 14 percent alcohol and included sherry and port. Special natural wines were flavored and included wines made from fruit other than grapes. The industry further classified table wines as either varietal or generic. Varietal table wines were identified by a specific grape variety (e.g., Cabernet Sauvignon). As of the valuation date, Federal regulations required that at least 51 percent of the wine sold under a varietal label be produced from the indicated grape variety. Generic table wines contained less than 51 percent of any single variety. Varietal wines generally were considered to be of higher quality and commanded higher prices than generic wines of the same producer. The U.S. wine market possessed three major price segments: low, popular, and premium. Total wine sales in the United States increased from 163 million gallons in 1960 to 434.7 million gallons in 1978.For the period 1970 to 1978, the greatest increase occurred from 1970 through 1972, when sales grew at a 12 percent compound annual rate. Growth slowed to a 4.3 percent compound annual rate from 1972 through 1978. In 1978 certain industry *281 analysts predicted that wine sales would reach 1 billion gallons per year by 1990. The various categories and price segments within the wine industry did not share equally in this growth. In general, wines perceived by consumers as possessing relatively high quality and selling for relatively high prices enjoyed greatest sales growth. From 1972 through 1978, a representative sample of wine producers in the low, popular, and premium price segments experienced compound annual growth rates in gallon sales of 1.43 percent, 13.00 percent, and 20.41 percent, respectively. From 1970 to 1978, annual table wine sales increased by 129 percent, from 133 million gallons to 304.3 million gallons, while annual sales of all other wines decreased by 3 percent. Although annual sales of special natural wines grew steadily through 1972, sales peaked at 72.8 million gallons in that year and declined to 50.5 million gallons in 1978. Sales of dessert wines decreased from 71.9 million gallons in 1972 to 54.2 million gallons in 1978, and annual sales of sparkling wines increased only modestly. Thus the share of the wine market represented by table wines increased from 50 percent in 1972 to 70 percent *282 in 1978. The growth in table wines and decline in dessert and special natural wines were largely attributable to the emerging consumer preference for popular and premium price wines. During the 1970's domestic wine producers encountered strong and increasingly successful competition from foreign producers. From 1970 through 1978, the sales of imported wines in the United States grew at a much higher rate than sales of domestic wines. Imports increased their U.S. market share from 11 percent in 1970 to 22 percent in 1978. Among the factors contributing to the growth in imports were consumer perception that imports possessed higher quality and European export subsidies provided in response to vast surpluses in Europe. In contrast to the U.S. import market, the potential for successfully exporting U.S. wine was minimal. Gallo's Position in the Wine Industry
From 1952 through 1972, Gallo was the generally acknowledged leader of the wine industry in every respect. Throughout that period, Gallo grew in size each year, possessed the largest and best distributor organization and sales force in the industry, constituted the only marketing-oriented firm in the industry, and successfully *283 introduced a number of new wine products. After developing the special natural wines Thunderbird, Ripple, and Boone's Farm, Gallo's annual sales of wines in that category grew substantially during 1960 through 1972, before peaking in the latter year at 47.5 million gallons. Gallo's total sales of over 109 million gallons in 1972 represented 32 percent of the U.S. market. Gallo did not fully share, however, in the growth of the U.S. wine market from 1972 through 1978. Whereas total sales in the industry grew steadily from 337 million gallons in 1972 to 434.7 million gallons in 1978, Gallo's volume declined to 107.5 million gallons in 1978, or 25 percent of the market. Moreover, from 1973 through 1976, Gallo averaged sales of only approximately 100 million gallons annually. Although Gallo's sales of table wines increased from 42 million gallons in 1972 to 60.5 million gallons in 1978, sales of special natural wines fell from from their peak in 1972 to 25.4 million gallons in 1978. A number of factors prevented Gallo's sales from keeping pace with the industry. By 1972 Gallo had become a mature company with its vast national distribution system in place. Gallo thus could achieve *284 further growth only by increasing sales in established markets, and merely maintaining sales at current levels became a tremendous burden. The 1970's marked the entry of several diversified and well-financed companies with strong marketing experience into the wine industry, often through purchasing wine producers previously owned by families or agricultural cooperatives. In 1978 four of the five largest domestic suppliers of wine after Gallo were Heublein, Inc., National Distillers and Chemical Company, The Coca Cola Company, and Joseph E. Seagram and Sons -- all of which were much larger than Gallo in terms of total assets, revenues, and profits. Thus, for the first time in its history, Gallo confronted effective marketing competition. Although Gallo increased its advertising substantially each year and continued to lead the industry in advertising expenditures as of 1978, Gallo's share of total industry advertizing and its share of display space in wine retail establishments were steadily declining. In August of 1976, Gallo consented to an order by the Federal Trade Commission, which prevented Gallo from engaging in certain relationships with its independent distributors. *285 As a result of the order, distributors that had previously sold only Gallo wines began to sell wines of competitors as well. As of the valuation date, 21 states maintained affirmation laws or warranty regulations requiring that alcoholic beverage sales within that state be at the producer's lowest U.S. price. Such provisions presented a dilemma to a wine producer, like Gallo, with national distribution: it risked losing market share in any local market if it did not meet the local market price, but must lower prices in the affirmation or warranty states if it did.This dilemma permitted certain importers who emphasized east coast markets to capture sales volume from Gallo. Changing consumer tastes, however, represented the most significant reason for the changing role of Gallo in the industry. Virtually all of Gallo's products, including its table wines, were positioned in the low price market segment. Indeed, its most successful products prior to 1972 were special natural wines. With the shift in consumer preferences to popular and premium price wines, Gallo suffered, unfairly in the opinion of its management, from a reputation as a producer of inexpensive and lower quality *286 wines. This image problem impeded attempts by Gallo to compete with the popular price producers in the table wine market and to introduce successful new products after 1972. Almaden, Paul Masson, Inglenook, Taylor, and Sebastiani -- often referred to collectively as the "AMITS" brands -- were the primary producers in the popular price segment. Most of the AMITS producers historically produced varietal wines, but in the late 1960's they began to produce lower price generic table wines in competition with Gallo. Possessing reputations for high quality, the AMITS producers were able to attract considerable sales volume, to charge higher prices than Gallo, and to relegate Gallo to the role of "price follower" in this market segment. The entry of imported wines into the segment exacerbated Gallo's competitive problems. Thus, although Gallo's annual table wine sales increased by almost 50 percent from 1972 to 1978, its market share of table wines fell from 25 percent in 1972 to 20 percent in 1978. In contrast to Gallo's experience prior to 1972, virtually all of its new wine products introduced between 1972 and 1978 were failures. These unsuccessful products included a special natural *287 wine similar to Boone's Farm, various products designed to compete with imports, and a line of varietal wines to compete with the AMITS brands. The varietal wines never comprised more than 2 percent of Gallo's total annual sales, even though Gallo initially priced them equal to the lowest price AMITS generic wines and subsequently lowered prices almost to the level of Gallo generics. As of the valuation date, Gallo planned to reintroduce its line of varietal table wines and had made a substantial investment in plant and equipment to produce the new varietals. Gallo's director of marketing research was pessimistic concerning the success of the line, however, in light of studies he conducted of consumer preferences and Gallo's image. Gallo's ability to produce all of its bottle needs (through Gallo Glass) historically provided a unique efficiency advantage. By the valuation date, however, a major competitor in the wine industry began producing bottles. Moreover, independent bottle producers, who supplied most other wine producers, held bottle prices fixed for several years immediately prior to the valuation date, a time during which Gallo Glass' production costs increased substantially. *288 Gallo had a large investment in Gallo Glass which was subject to the risk that plastic and "bag-in-the-box" containers would become widely utilized the U.S. wine market. As of the valuation date, Ernest and Julio were 69 and 68 years old, respectively. although the second generation of Gallo family members possessed substantial management ability, the talents that Ernest and Julio possessed as top management would be difficult to duplicate. In sum, although Gallo remained the largest wine producer in the United States, with a market share almost double that of the second largest producer, its performance in the years immediately preceding the valuation date and its prospects for the future were not as bright as its record prior to 1972. Gallo experienced a substantial decline in its total market share and weakness in traditional areas of strength. In light of its image as a quantity producer of inexpensive wines, Gallo appeared ill-equipped to take advantage of emerging trends in the industry. Financial Condition of Gallo
[1]
*289 Gallo's earnings generally declined during 1972 through 1978. [2] Although nominal revenues increased steadily each year and were approximately 50 percent higher in 1978 than in 1972, after adjustment for inflation, revenues in 1978 were virtually equivalent to revenues in 1972. Cost of sales increased by 70 percent over the period. These figures reflected the shift in Gallo's product mix to a higher percentage of table wines, which were more expensive to produce than special natural and dessert wines. Moreover, most of the growth in Gallo's table wine sales occurred in its Carlo Rossi label, the less profitable of its two primary table wine labels. Although earnings in 1977 and 1978 were each only approximately one-half of 1972 earnings, this downward trend was by no means steady; earnings were very erratic over the 7-year period. Earnings in 1978 approximately equaled average earnings over the 5-year period immediately preceding the valuation date. The volatile price of grapes, the most significant cost variable for Gallo, was primarily responsible for the fluctuations in earnings. Gallo *290 grew in its own vineyards only 5 percent of its grape requirements. It purchased approximately 83 percent of its requirements from independent growers under multi-year contracts in which Gallo guaranteed the grower the higher of market price or a fixed minimum price for his entire crop. Reflecting the increased marketing competition in the wine industry, selling and advertising expenses in 1978 were approximately 60 percent higher than in 1972. General and administrative expenses nearly doubled over this period. The annual dvidend requirements on Dry Creek preferred stock outstanding as of the valuation date equaled approximately 40 percent of Gallo's average annual earnings for the 5-year period immediately preceding the valuation date. Gallo's earnings in 1978 were not sufficient to support any dividends to common shareholders of Dry Creek. Gallo's balance sheet as of August 31, 1978, indicated that Gallo possessed a sound financial position and carried relatively little debt. Gallo's fiscal year, however, ended immediately prior to the processing of the annual grape crop, which Gallo typically financed with substantial short-term borrowings. The average month-end balance *291 of such debt for fiscal year 1978 was almost three times greater than the balance on August 31. Economic Conditions as of the Valuation Date
In 1976, 1977, and 1978, the U.S. gross national product grew at rates of 5.4 percent, 5.5 percent, and 5.0 percent, respectively, and the rate of inflation (measured by the consumer price index) was 5.7 percent, 6.5 percent, and 7.6 percent, respectively. Interest rates increased over this period, most sharply in the year preceding the valuation date. The prime rate charged by Bank of America was 7.25 percent, 6.25 percent, 7.75 percent, and 10.5 percent on January 1, 1976, January 1, 1977, January 1, 1978, and November 1, 1978, respectively. The average price-earnings ratio for Standard and Poor's 400 Industrial Stocks was 10.4, 9.6, and 8.2 for the years 1976, 1977, and 1978, respectively, and the ratio for the Dow Jones Industrials was 10.4, 9.3, and 7.1 for those years, respectively. As of the valuation date, several respected economists predicted a recession in 1979. Expert Valuations
Petitioner's primary expert witnesses, Ross J. Cadenasso (Cadenasso) and William A. Shutzer (Shutzer), and respondent's expert witness, *292 Glenn M. Desmond (Desmond), utilized similar approaches in valuing the stock in issue. Each expert concluded that the value of Dry Creek was essentially equal to the value of Gallo. Determining the value of Dry Creek stock thus entailed determining the value of Gallo, taking into account Dry Creek's capital structure. The experts first estimated the amount for which Dry Creek common stock would sell, if traded in an active public market, based primarily upon comparisons of various financial and operating data of Gallo with data of publicly traded companies. The experts all concluded that, as of the valuation date, there existed only two publicly traded wine companies and only one, Canandaigua Wine Company (Canandaigua), was even remotely comparable to Gallo. The experts therefore selected additional comparable companies from other industries, including the beer, distilled spirits, food, and soft drink industries. From the estimate based on comparables, the experts deducted a percentage discount because shares in Dry Creek were not publicly traded. Despite the similarity in methodology, the ultimate value of the 1,178 Class J common shares determined by respondent's expert far *293 exceeded the values determined by petitioner's experts. Cadenasso
Cadenasso was a self-employed corporate financial consultant and appraiser of corporations and corporate securities. He was previously employed for a number of years by a large, national investment banking firm and served for eight years as vice president in the corporate finance department of that firm. Petitioner reported the 1,178 Class J shares on decedent's estate tax return at $290 per share, the value for which Cadenasso appraised the shares in a report dated March 1, 1979. Cadenasso prepared an additional report dated April 4, 1984, in which he described in greater detail the valuation process that he used in 1979. Cadenasso first analyzed the U.S. wine industry and Gallo's position therein. He noted that the industry experienced considerable growth during the years preceding the valuation date and that Gallo remained the largest producer and marketer of wines as of the valuation date. Cadenasso nevertheless concluded that Gallo would probably continue to have difficulty sustaining market share in the years after the valuation date for the following reasons: Gallo's failure to exploit the higher *294 price segments of the table wine market, the fastest growing portion of that market; the entry of large, marketing-oriented companies into the wine industry, which diminished the competitive advantage traditionally enjoyed by Gallo in that area; the vigorous growth of imported wines; the expected continuing decline of dessert and special natural wines, which remained a significant portion of Gallo's sales as of the valuation date; and the 1976 consent order with the Federal Trade Commission. Cadenasso next examined Gallo's financial statements for the 5 years immediately preceding the valuation date and computed various financial relationships therefrom. Although Cadenasso considered Gallo's balance sheet and compiled data therefrom, he concluded that such data were not as useful in valuing Gallo as were profitability, sales and earnings growth, and consistency in earnings. Cadenasso believed that a stock's price-earnings ratio (market price per share divided by earnings per share), computed using earnings that are representative of the company's earnings power, was a reliable indicator of market value and the ratio most widely used by investors. Cadenasso selected 10 companies *295 for comparison with Gallo. In addition to Canandaigua, Cadenasso chose five distilling companies and four brewing companies. Cadenasso believed that distillers and brewers provided useful comparisons because they operated in the same regulated environment as Gallo and their products competed with wine to some extent. Moreover, Cadenasso noted that three of the distillers selected as comparables owned significant California wineries. All of the comparables chosen by Cadenasso were successful companies with substantial trading volume in their stocks. Cadenasso concluded that the stock of four of the comparables possessed above-average investment attractiveness and quality and that six of the companies were average or below average. Cadenasso ranked Gallo and the 10 comparables in terms of return on common equity, both for the immediately preceding year and for the average of the preceding 5 years; growth in sales and earnings over the preceding 5 years; and earnings consistency, measured by the number of years earnings declined over the preceding 5 years and the total percentage decline in those years. Gallo ranked last among the 11 companies and at or near the bottom in all six *296 measures of investment merit. Cadenasso concluded that the fair market value of Dry Creek common stock would have been $450 per share on the valuation date, if the stock were publicly traded. At this price, the stock's price-earnings ratio would be among the highest of the six comparables considered average or below average and its price-book value ratio (market price per share divided by book value per share) would be among the lowest of those companies. Cadenasso believed that this latter figure reflected that Gallo's profitability was the lowest among the group. Because Dry Creek stock was not publicly traded, Cadenasso believed the value of the Class J shares to be at least 35 percent below the $450 per share figure. He therefore computed a final value of $290 per share. Shutzer
In February 1984, Gallo retained Shearson Lehman/American Express Inc. (Lehman Brothers), an investment banking firm, to value the 1,178 shares of Class J stock as of the valuation date. Shutzer was a managing director of Lehman Brothers and participated in the appraisal of the Dry Creek stock. In early March 1984, Lehman Brothers determined a value of $237 per share. Shutzer then communicated *297 this value to Gallo prior to Lehman Brothers' receiving any notice of the value reported on decedent's estate tax return or the conclusions reached by Cadenasso or Desmond. Lehman Brothers prepared a detailed report dated November 9, 1984, supporting its opinion as to value, and Shutzer was petitioner's principal expert witness at trial. The valuation process used and conclusions reached by Lehman Brothers were quite similar to those of Cadenasso. After a detailed analysis of Gallo, the wine industry, and economic conditions as of the valuation date, Lehman Brothers compared Gallo with Canandaigua and representative companies in the brewing, distilling, soft drink, and single discretionary food product industries. Leham Brothers selected the three additional beverage industries because they all competed somewhat and because the brewing and distilling companies operated in the same regulated environment as wine companies. It believed that producers of single product discretionary foods were, like Gallo, subject to fluctuations in agricultural raw material prices and to competitive market conditions. Lehman Brothers concluded that the brewing industry was most comparable to the *298 wine industry because the two industries exhibited similar growth patterns (although growth was higher in the wine industry and was declining in the bear industry), competition among marketing-oriented companies, and product market segmentation. Lehman Brothers believed that an investor might use one or more of the following ratio-based methods in valuing closely held stock: price-earnings, price-book value, dividend capitalization (annual dividends per share divided by market price per share), adjusted operating profit capitalization (income from operations plus interest and depreciation divided by market value of total outstanding shares plus long-term debt and other long-term liabilities), and price-revenues (market price per share divided by net revenues per share). Because stock price or value is an element of each ratio, an investor can appraise a stock by determining all elements of the ratio other than stock value and estimating the aggregate ratio by comparisons with publicly traded companies, whose ratios are readily computable. Lehman Brothers believed that, whatever method used, the valuation of an operating business implicitly entailed an estimate of the future earnings *299 potential of the business and that the price-earnings ratio most directly and unambiguously reflected the financial markets' assessment of such future earnings potential. According to Lehman Brothers, price-earnings was the ratio it and other investment banking firms primarily used in stock and business valuations and was most often considered by investors. Lehman Brothers believed that dividend capitalization was not useful for valuing Dry Creek common stock in part because Dry Creek's ability to pay dividends on common shares as "questionable at best" in light of preferred stock dividend requirements. Lehman Brothers considered price-revenues useful where, unlike Gallo, the subject company had little earnings history, but misleading for comparing firms in different industries and with different operating characteristics and cost structures. Lehman Brothers concluded that price-book value was an unreliable indicator of value because historic asset cost often did not reflect future earnings potential. The believed that adjusted operating profit capitalization was misleading for a company like Gallo that must reinvest cash flow and whose debt reported at year end was not representative *300 of debt carried during the year. Lehman Brothers therefore used primarily the price-earnings ratio in valuing Gallo based upon comparative analysis. Lehman Brothers did not, however, rely exclusively upon historical earnings or earnings-based financial data in valuing Dry Creek stock under the price-earnings method. In estimating the price-earnings ratio for which Dry Creek common would trade in a public market, Lehman Brothers carefully compared Gallo with each of the comparable companies and considered all factors that Lehman Brothers believed might affect the ratio. In addition to relative earnings data, these factors included relative size, market share, financial security, brand loyalty, diversification, and dividend-paying capacity. For example, Lehman Brothers concluded that Dry Creek stock would sell for a higher multiple of earnings than would Canandaigua, even though Canandaigua realized substantially greater earnings growth and return on equity than Gallo. Lehman Brothers ultimately assigned Dry Creek stock a price-earnings ratio near the average for the comparable companies inthe brewing and discretionary food industries, although most of those companies experienced *301 operating results far superior to Gallo's. After assigning a preliminary price-earnings ratio to Dry Creek stock based upon comparisons of Gallo with each of the comparable companies, Lehman Brothers undertook similar comparative analyses using the price-book value and adjusted operating profit capitalization ratios. Although Lehman Brothers compared Gallo only with Canandaigua and the brewing companies under these methods, the results confirmed the reasonableness of the preliminary price-earnings ratio. Lehman Brothers next examined Gallo's balance sheet and considered whether the value of Gallo's assets might justify a higher valuation for Dry Creek stock than an appraisal under the price-earnings method. Because Gallo's assets consisted primarily of operating wineries and bottle plants that could not productively be put to any other use, Lehman Brothers concluded that any liquidation value of Gallo's assets would not exceed the preliminary price-earnings valuation. Lehman Brothers specifically considered whether Gallo possessed any goodwill or other intangible asset value. Lehman Brothers concluded that Dry Creek common shares would trade in a public market for $370 per share, *302 computed by multiplying the estimated price-earnings ratio times Gallo's 1978 earnings (plus an immaterial amount of Dry Creek earnings) per share of Dry Creek common stock. Lehman Brothers then discounted the $370 figure by 36 percent to reflect that Dry Creek stock was not actively traded, yielding a final value of $237 per share. Desmond
Desmond owned a firm specializing in the valuation of businesses and business assets. Respondent engaged Desmond in 1983 to value the 1,178 Dry Creek Class J shares as of the valuation date. In performing a comparative analysis similar to the approaches of Cadenasso and Lehman Brothers, Desmond selected Canandaigua and 15 companies engaged in the brewing, distilling, and food processing industries. The 15 companies included two brewers and four distillers also selected by both Cadenasso and Lehman Brothers. Desmond's report included a schedule listing 16 asset, leverage, turnover, and earnings relationships realized in 1976, 1977, and 1978 by Gallo and each of the 16 comparables. In 1978, Gallo ranked average (i.e., ninth) among the 17 companies with respect to two relationships, above average with respect to five relationships, and *303 below average with respect to nine relationships. Gallo ranked below average in 1978 with respect to each of the earnings relationships and last in both pre-tax and after-tax return on equity. Desmond computed values for Dry Creek using each of the five ratios considered by Lehman Brothers. [3] He first determined, with respect to each ratio, the range exhibited by the 16 comparables, after eliminating the companies with the two highest and two lowest ratios. Based on these ranges, Desmond then assigned to Gallo ratios that, under each of the five valuation methods, would yield the highest value for Dry Creek. As he stated in his report: "Because of Gallo's overall superiority in terms of operating results, market domination and industry potential as compared with the 16 comparable publicly traded companies the ratios and rates Gallo [sic] fall at the most favorable end of each respective range established by the comparatives." *304 To value Dry Creek using the adjusted operating profit capitalization ratio, Desmond used (as an addition in the denominator of the ratio) the amount of Gallo's interest-bearing debt as of August 31, 1978, without adjustment. He utilized (as an addition in the numerator of the ratio) Gallo's total interest expense for the year ended August 31, 1978. In applying the dividend capitalization method, Desmond first concluded that Dry Creek could pay common stock dividends totaling 40 percent of Gallo's annual net income. He therefore computed a value for Dry Creek under this method by dividing 40 percent of Gallo's total earnings for 1978 by the dividend capitalization ratio that he determined based on comparables. In using the price-revenues method, Desmond increased Gallo's reported net revenues by Gallo Glass' net revenues. Desmond made this adjustment because Gallo and Gallo Glass did not report on a consolidated basis. In addition to the five values for Dry Creek computed using comparative analysis, Desmond computed an unadjusted book value and an adjusted book value. The former was simply Gallo's total stockholders' equity as of August 31, 1978. In computing the latter, *305 Desmond estimated land values based upon certain acquisitions by Gallo and upon comparable sales and property assessment data. He did not, however, appraise the other items of property, plant, and equipment. Instead, "the estimated contributory values of improvements and equipment was based upon historical cost data * * * to which certain adjustments have been made." Desmond computed the adjusted values for the various assets by multiplying the costs of the assets by various percentages (ranging from 60 percent to 100 percent) but did not explain how he determined the percentages. The adjusted values substantially exceeded the book values of these assets. Desmond thus computed seven values for Dry Creek. These values varied over a substantial range; the highest value, computed under the price-revenues method, exceeded the lowest value, computed under the price-earnings method, by over 2-1/2 times. Desmond stated in his report: In analyzing each valuation approach for its degree of applicability in estimating the minority equity value of Dry Creek Corporation stock, this appraiser accords primary consideration to the earnings and cash flow valuation methods -- price earnings, *306 adjusted operating profit capitalization, and dividend capitalization. Secondary weight is given the two formula methods: market price to book and aggregate market price to net revenues. The unadjusted book equity value is not indicative of economic value of Gallo as an operating enterprise and, therefore, is accorded little weight. Desmond's ultimate value for Dry Creek (assuming its stock were publicy traded) was approximately equal to the unadjusted book value, the dividend capitalization value, and the average of the price-earnings, adjusted operating profit capitalization, and dividend capitalization values. This value implied a price-earnings ratio for the common stock that exceeded by more than 50 percent the price-earnings ratio determined by Desmond based on comparables. The publicly traded value for Dry Creek computed by Desmond under the price-earnings method would have yielded a per share value for the common stock virtually equal to the prediscount value computed by Lehman Brothers. [4]
*307 Desmond concluded that, after a 10 percent discount to reflect they Dry Creek stock was not publicly traded, the value of the common stock was $689 per share. Pratt
In August 1984, petitioner retained Shannon P. Pratt (Pratt) to determine the appropriate discount for lack of marketability for the 1,178 Class J shares, as of the valuation date. Pratt was a senior member of the American Society of Appraisers and was president of a firm specializing in the valuation of businesses and business interests. Based upon his own empirical comparisons of the initial public offering prices of selected common stocks with prices from sales occurring before the offerings, Pratt concluded that 50 percent was an appropriate discount. ULTIMATE FINDING OF FACT The fair market value of the Dry Creek Class J common shares includible in decedent's gross estate was $237 per share on the valuation date. OPINION Property includible in the gross estate is generally included at its fair market value on the date of the decedent's death. Sec. 2031(a); [5] sec. 20.2031-1(b), Estate Tax Regs. Fair market value is the price at which the property would change hands between a willing buyer and a *308 willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of all relevant facts. United States v. Cartwright,411 U.S. 546, 551 (1973); sec. 20.2031-1(b), Estate Tax Regs. Determining fair market value is a question of fact, and the trier of fact must weigh all relevant evidence and draw appropriate inferences. Hamm v. Commissioner,325 F.2d 934, 938 (8th Cir. 1963), affg. a Memorandum Opinion of this Court; Estate of Andrews v. Commissioner,79 T.C. 938, 940 (1982). Where the value of unlisted stock cannot be determined by reference to bid and ask or sales prices, [6] the value thereof should be based upon, in addition to all other factors, the value of listed stock of corporations engaged in the same or a similar line of business. Sec. 2031(b). Section 20.2031-2(f), Estate Tax Regs., provides that the company's net worth, prospective earnings power, and dividend-paying capacity should be considered, along with "other relevant factors. *309 " These other relevant factors include the goodwill of the business, the economic outlook in the particular industry, the company's position in the industry and its management, and the degree of control represented by the block of stock to be valued. Sec. 20.2031-2(f), Estate Tax Regs. The relative weight accorded to the various factors depends upon the facts of each case. Messing v. Commissioner,48 T.C. 502, 512 (1967); sec. 20.2031-2(f), Estate Tax Regs. Earnings are relatively more important for valuing the stock of operating companies, whereas asset value is relatively more important for investment companies. Levenson's Estate v. Commissioner,282 F.2d 581, 586 (3d Cir. 1960); Central Trust Co. v. United States,305 F.2d 393, 404 (Ct. Cl. 1962).See also Estate of Andrews v. Commissioner,supra."Financial data is important only to the extent it furnishes a basis for an informed judgment of the future performance of the particular company." Snyder's Estate v. United States,285 F.2d 857, 861 (4th Cir. 1961). *310 Thus, for operating companies, the proper focus is typically upon earnings trends, if such trends are representative of future expectations. Snyder's Estate v. United States,supra;Central Trust Co. v. United States,supra.
Reliance on Expert Opinions
Opinion testimony of an expert is admissible if and because it will assist the trier of fact to understand evidence that will determine a fact in issue. See Fed. R. Evid. 702. Such evidence must be weighed in light of the demonstrated qualifications of the expert and all other evidence of value. Estate of Christ v. Commissioner,480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970); Anderson v. Commissioner,250 F.2d 242, 249 (5th Cir. 1957), affg. a Memorandum Opinion of this Court. We are not bound by the opinion of any expert witness when that opinion is contrary to our judgment. Kreis' Estate v. Commissioner,227 F.2d 753, 755 (6th Cir. 1955); Tripp v. Commissioner,337 F.2d 432 (7th Cir. 1964), affg. a Memorandum Opinion of this Court. We may embrace or *311 reject expert testimony, whichever, in our best judgment, is appropriate. Helvering v. Nat. Grocery Co.,304 U.S. 282 (1938); Silverman v. Commissioner,538 F.2d 927, 933 (2d Cir. 1976), affg. a Memorandum Opinion of this Court; In Re Williams' Estate,256 F.2d 217, 219 (9th Cir. 1958), affg. a Memorandum Opinion of this Court. Thus we have rejected expert testimony where the witness' opinion of value was so exaggerated that his testimony was incredible. See Chiu v. Commissioner,84 T.C. 722 (1985); Dean v. Commissioner,83 T.C. 56, 75 (1984); Fuchs v. Commissioner,83 T.C. 79, 99 (1984). Both petitioner and respondent rely primarily upon the valuations prepared by their respective experts. Petitioner asks us to implement "the policy adopted in Buffalo Tool & Die Manufacturing Co. v. Commissioner,74 T.C. 441, 452 (1980), * * * that in proper cases the Court should adopt the value put forward by the most credible party." In that case we stated: We are convinced that the valuation issue is capable of resolution by the parties themselves through an agreement *312 which will reflect a compromise Solomon-like adjustment, thereby saving the expenditure of time, effort, and money by the parties and the Court -- a process not likely to produce a better result. Indeed, each of the parties should keep in mind that, in the final analysis, the Court may find the evidence of valuation by one of the parties sufficiently more convincing than that of the other party, so that the final result will produce a significant financial defeat for one or the other, rather than a middle-of-the-road compromise which we suspect each of the parties expects the Court to reach. If the parties insist on our valuing any or all of the assets, we will. We do not intend to avoid our responsibilities but instead seek to administer to them more efficiently -- a factor which has become increasingly important in light of the constantly expanding workload of the Court. [74 T.C. at 452.] That language should not be misinterpreted, as some litigants apparently have, as expressing an intention of the Court to sanction a party who takes an unreasonable position. See, e.g., the argument of the taxpayer in Estate of Kaplin v. Commissioner,748 F.2d 1109, 1111-1112 (6th Cir. 1984), *313 revg. on another ground a Memorandum Opinion of this Court. Nothing in Buffalo Tool & Die requires us to accept any opinion that does not withstand careful analysis. If expert testimony is to serve its intended purpose, however, we should not and will not reject it without objective reasons for doing so. Buffalo Tool & Die simply indicates that an objective reason for doing so is that another expert's opinion is more persuasive. In addition Buffalo Tool & Die does not require that we find that an expert's report is more persuasive in its entirety. We can find one such report more persuasive on one ultimate element of valuation and another more persuasive on another ultimate element. Respondent's Valuation Evidence
In the present case, we find the opinion of respondent's expert, Desmond, to be unreliable and, therefore, do not accept his opinion as a basis for our decision. In valuing Gallo under each of the five methods based on comparables that he used, Desmond assigned to Gallo ratios that would result in the highest possible valuations. Desmond's method was pervasive and abolute: he made no real attempt to compare Gallo with any of the individual comparables. *314 Even if Gallo were an above-average company, which it was not when ranked among the comparables, it would be unreasonable to expect Gallo to be most attractive with respect to each and every ratio. None of the 16 comparables was so positioned. The emerging consumer preference for higher price wines with perceived higher quality was apparent as of the valuation date, as was Gallo's actual past and expected future inability to exploit this trend. Gallo also felt the effects of the entry of competitive marketing organizations and imports into the U.S. wine market, the consent order with the Federal Trade Commission, and the state affirmation laws or warranty regulations. Because of these and other factors mentioned in our findings, Gallo's earnings exhibited a sharp downward trend after 1972. By virtually any measure of investment merit, Gallo was significantly less attractive on the valuation date than in 1972. Gallo's earnings were particularly poor relative to the comparable companies,and Desmond's testimony at trial indicated that he realized the importance of earnings in valuing an operating manufacturer like Gallo. Desmond explained the apparent inconsistency of choosing *315 relatively favorable ratios for Gallo as reflecting his belief that earnings of closely held and publicly traded companies are not comparable. Respondent argues this point extensively in his brief and asserts that Gallo incurred expenses not typically incurred by public companies and that Gallo used accounting methods that understated its earnings relative to earnings of public companies. With respect to expenses, respondent points to the testimony of Joseph Gallo that, unlike management of many public companies preoccupied with short-term earnings, Gallo's management made financial and operating decisions with a view toward long-term success. Respondent further focuses upon the parties' oral stipulation that the annual salaries of the four second generation members of the Gallo family were in the aggregate $200,000 more than the salaries of other Gallo employees of similar service and rank. There is no evidence, however, that the salaries paid to the Gallo family members were excessive. Members of the second generation spent their entire business careers with Gallo and ultimately would assume top management from Ernest and Julio. More importantly, the hypothetical purchaser *316 of 1,178 shares of Dry Creek Class J stock would have little hope to alter the compensation or other expense policies of Gallo. Earnings reflecting actual expenditures of funds, not expenditures that Gallo might incur if it were a public company, are most relevant for valuing Gallo. With respect to accounting methods, respondent notes that Gallo utilized the sum-of-the-years'-digits method of depreciation. While a rational investor presumably would adjust the earnings of the subject company to reflect accounting methods consistent with those used by comparables, nothing indicates that such an adjustment was necessary here. The record does not indicate what Gallo's earnings would have been under different accounting methods or even which of the comparable companies used different depreciation or other accounting methods. Had Desmond or respondent possessed genuine doubts concerning the consistency of Gallo's accounting methods with those of comparables, they should have at least attempted to answer these questions. In light of his distrust of Gallo's reported earnings, Desmond testified that he relied primarily upon Gallo's relatively strong rankings with respect to four balance *317 sheet relationships -- current ratio (fifth), quick ratio (twelfth), debt to total assets (fourth) and debt to equity (fourth) -- in placing Gallo among the most attractive of the comparables. Even if, like Desmond, we disregard Gallo's poor relative earnings and earnings-based relationships (which we do not), we find serious problems with Desmond's conclusions. Gallo's current ratio (current assets divided by current liabilities) was misleadingly high at the end of its fiscal year due to its seasonal financing needs and practices. Had Desmond adjusted Gallo's current ratio to reflect average short-term borrowings outstanding during 1978 (with an equal increase in current assets), Gallo would have ranked below average with respect to this relationship. The two leverage relationships (debt to total assets and debt to equity) computed for Gallo by Desmond were also misleading. In computing these relationships, Desmond made no adjustment to reflect the outstanding Dry Creek preferred stock. The parties argue on brief whether preferred stock should technically be treated as equity or debt in the computations. Either way a rational investor in Dry Creek common stock would consider *318 the leverage relationships computed by Desmond in light of the outstanding preferred. The holders of the preferred stock possessed a substantial prior claim on assets, and preferred dividend requirements exhausted dividend-paying capacity in 1978. Attempting to justify Desmond's overly favorable appraisal of Gallo, both Desmond and respondent noted Gallo's large size and the expected future growth in the wine industry. Although size may indeed be a source of security, we find little evidence that Gallo's being the well-established giant of the industry in terms of market share (which in fact fell significantly from 32 percent to 25 percent) implied any special promise of improved financial performance. With its national distribution system in place, Gallo could look forward to little opportunity of expanding geographic markets. As in Snyder's Estate v. United States,285 F.2d 857, 859 (4th Cir. 1961), the company's "relatively greater success in the past meant that * * * there were fewer new potential consumers to be won by vigorous advertising and promotional campaigns." More importantly, Gallo's size in fact contributed to its poor image and inability to succeed *319 in the changing consumer market. Gallo's director of marketing research testified: A. Well, the -- Gallo was in a terrible position -- perceptually in a terrible position to meet the needs of the consumer groups that were going to be the biggest and most aggressively growing groups in the table wine market. We were really not providing the kinds of imagery values that they wanted, and we were really a long way away from taking care of those things. Q. What could be done about it? A. Well, the only way to do it is to change the image of the brand which is a hellishly difficult task. And it was particularly complicated in this situation because some of the reasons why Gallo was stuck way over on the other side of the map was that it was perceived to be this hugh monolithic mass production, you know, factory with high speed blinds, and chemicals, all the wines made with chemicals. I mean, people didn't perceive it as a small boutique, an interesting part, you know, crafted product. No rational investor would assume without doubt that the growth prospects of the wine industry justified ignoring the very real and substantial obstacles facing Gallo in that industry. *320 Respondent argues in his brief that Gallo expected to reap large profits from the reintroduction of its varietal wines and that Gallo could eliminate any image problems by marketing the new varietals under a non-Gallo label. We first note that Desmond virtually ignored the prospects for the new varietals, both in his report and at trial. In light of Gallo's past experience with varietals, we believe such treatment was proper. Respondent's forecast is pure speculation unsupported by the record, and Gallo's marketing research director was pessimistic concerning varietals. As to use of another label, Gallo's executive vice president for marketing testified that the company did not expect significant sales of varietals but planned to reintroduce them to improve the image of Gallo's primary label. Using another label would defeat this purpose. In any event, respondent cannot substitute his own business judgment for that of Gallo, which had not planned to use a different label. Cf. Snyder's Estate v. United States,285 F.2d at 859. In addition to the fatal flaws in the overall approach of Desmond's valuation, we find serious problems with his application of the *321 specific valuation methods. We note below the more egregious of those problems. Desmond assumed that Dry Creek could pay annual dividends to common shareholders equal to 40 percent of Gallo's earnings, in valuing Dry Creek under the dividend capitalization method. He admitted at trial, however, that preferred dividend requirements, which equaled 40 percent of Gallo's earnings for 1978, precluded payment of a dividend to common shareholders in that year. Gallo's 1978 earnings approximated average earnings for the 5 years immediately preceding the valuation date. Respondent argues that Dry Creek could redeem preferred shares beginning in 1982 and could thereafter pay common dividends. Notwithstanding respondent's speculation, no evidence suggests that Dry Creek was likely to redeem any portion of the preferred stock after it acquired the power to do so. Moreover, absent dramatic earnings increases, Gallo (or Dry Creek) presumably could finance the substantial redemption payments only through the issuance of debt, which would reduce Dry Creek's dividend-paying capacity. No evidence suggested such increases in earnings after the valuation date. Desmond added Gallo Glass' net revenues *322 to Gallo's reported net revenues in valuing Dry Creek under the price-revenues method. At trial he stated that the purpose of this adjustment was to consolidate the companies' revenues. He later admitted, however, that because all of Gallo Glass' sales were to Gallo, if the companies had reported on a consolidated basis, Gallo Glass' sales would properly be eliminated as intracompany transactions. In applying the adjusted operating profit capitalization method, Desmond used Gallo's actual interest expense for 1978. He did not, however, adjust the amount of debt outstanding as of the fiscal year end to reflect the significantly higher average debt outstanding during the year. Desmond testified at trial that the adjusted operating profit ratio entailed a "purifying" of earnings, primarily through the addition of depreciation to operating profit. We repeat that, had Desmond seriously questioned the comparability of Gallo's reported earnings with earnings of the comparable companies, he should have attempted a reasoned investigation before making arbitrary adjustments. Nothing indicates that Gallo's reported depreciation did not reflect economic reality (at least to the same extent *323 as depreciation reported by the comparables), particularly in light of Gallo's substantial reinvestment requirements. Desmond admitted at trial that Gallo's reinvestment of earnings in plant and equipment exceeded depreciation charges during the years that he examined. Desmond's treatment of his valuation using adjusted operating profit capitalization illustrates the difficulty confronting us in understanding exactly how Desmond weighted his various valuations. Desmond stated in his report that he gave primary consideration to price-earnings, dividend capitalization, and adjusted operating profit capitalization. At trial he testified: "Maybe it was equal weight to all three in my mind." He later stated, however: "Because of the nature of the [adjusted operating profit capitalization] method I gave it -- of the three that I gave most weight to, I gave it, in my mind, the lesser weight than the other two methods." Desmond described the "nature of the method" as follows: That's an academic way of appraising a company. It means something to appraisers. It doesn't always mean something to other people. It's not readily understood. It's complicated to explain. A lot of assumptions *324 go into it. Sometimes it's used because there just isn't any other way to purify the operating profit. With those caveats in mind and yet some weight, I thought, needed to be given to it, it was another run at the earnings and how the earnings looked in terms of value. I gave it some weight. Similarly, with respect to price-book value and price-revenues, to which Desmond gave "secondary weight" according to his report, he testified: "I felt that weight given to those should be very modest at best." Respondent asserts in his brief that the valuations under these methods had "no bearing" upon Desmond's ultimate valuation. Concerning adjusted book value, the only noncomparative method given any weight, Desmond testified: "I took a shot at the -- at adjusting the balance sheets, tangible assets. I felt that that was the least important to satisfy myself as to where those values might be on a value [in] * * * place basis." Indeed, from the record before us, we cannot determine whether the adjusted values that Desmond computed for the land improvement and equipment items bore any relationship to their fair market values. His report stated that the adjusted values were "based *325 upon historical cost data trended from the date of acquisition," but we have no way of knowing how Desmond determined the various percentages by which he multiplied the costs of the various assets. Cf. Estate of Andrews v. Commissioner,79 T.C. 938, 948 (1982). Petitioner's Valuation Evidence
In contrast to Desmond, petitioner's experts acted reasonably in selecting comparable companies, in drawing conclusions based upon careful comparisons of Gallo with individual comparables, in focusing primarily upon earnings, and in relying primarily upon the price-earnings method of valuation. Respondent initially asserts several subjective reasons for rejecting the testimony of petitioner's experts. He suggests that the witnesses were biased because they had long-term relationships with petitioner and were paid well for their reports. Respondent refers to valuations prepared by Cadenasso or Lehman Brothers several years before the valuation date. The Court permitted respondent to cross-examine Cadenasso and Shutzer with respect to the earlier reports to uncover any inconsistencies in methodology with their later reports. The record discloses no such inconsistencies. *326 In any event, a close relationship with a party is obviously not, standing alone, sufficient to discredit the testimony of a witness. The result of any such rule would be to disqualify those most knowledgeable about any problem. The Court's task is to determine the credibility of any lay or expert witness based upon objective facts, the reasonableness of the testimony, the consistency of the statements made by the witness, and, in some cases, the demeanor of the witness. In the present case, as in the ordinary case, any doubts about the reliability of an expert's testimony are based on the failure of the facts to support his assumptions and his ultimate opinion rather than any doubt as to whether the expert is expressing a truthful opinion. [7]
Based on the entire record, we conclude that Lehman Brothers was well qualified to express an opinion as to the value of the stock in issue and that Lehman Brothers' opinion has not been impeached by any objective evidence. *327 We therefore agree with its opinion that the pre-discount value of the stock as of the valuation date was $370 per share. Cadenasso's valuation was consistent in approach and similar, if somewhat higher, in result. We nevertheless hold that the more rigorous and detailed analysis in Lehman Brothers' report justifies a lower value than that underlying the value reported in decedent's estate tax return. Many of respondent's objections to Lehman Brothers' valuation are the same arguments made by him in support of Desmond's. We shall not repeat those arguments and our reasons for rejecting them but instead address below only respondent's arguments not previously considered. Respondent disputes Lehman Brothers' conclusion that brewing companies were most comparable to Gallo, in light of the superior growth forecast for the wine industry. Gallo had not, however, fully participated in the past growth in the wine industry and faced substantial competitive problems in the future. Moreover, Lehman Brothers compared Gallo with each of the comparables in using the price-earnings method, its primary valuation method. Only with respect to the two secondary or "check" methods did Lehman *328 Brothers compare Gallo exclusively with Canandaigua and beer companies. Respondent presumably believes that comparisons with the distilling and soft drink companies, which generally realized financial results superior to brewers, would yield higher valuations for Gallo. But Desmond himself rejected soft drink companies as comparables, a conclusion with which respondent agrees in his brief. More importantly, unlike Desmond, Lehman Brothers made careful and reasoned comparisons with each comparable instead of arbitrarily relying upon the outer limit of a range. Nothing suggests that, under the approach taken by Lehman Brothers, considering the other companies under the other methods would yield a higher value for Gallo than that computed under the price-earnings method. Respondent similarly asserts that Lehman Brothers relied too heavily upon the price-earnings method and should have given greater weight to the other methods used by Desmond. Lehman Brothers did not ignore the other methods but considered and rejected those methods as inappropriate. We believe Lehman Brothers' conclusions were reasonable, particularly in light of the problems Desmond had in attempting to apply *329 the other methods. Certainly Lehman Brothers' approach was preferable to that of Desmond, who arbitrarily computed a maximum value using each method and then unsystematically derived an ultimate valuation. Respondent's primary argument is that Lehman Brothers focused excessively upon earnings in its valuation. Respondent does not dispute that earnings were more important than assets in valuing Gallo, but he argues that Lehman Brothers incorrectly ignored asset value. See Estate of Andrews v. Commissioner,79 T.C. 938, 945 (1982). Lehman Brothers did not ignore asset value but concluded, after considering Gallo's assets, that Gallo did not possess sufficient asset value to sustain a value for Dry Creek stock exceeding the price-earnings valuation. Lehman Brothers admittedly did not appraise Gallo's assets, but, with the exception of land, nor did Desmond. Unlike Estate of Andrews, the current case does not present a situation where net asset value per share demonstrably exceeded an earnings-based valuation. See also Hamm v. Commissioner,325 F.2d 934 (8th Cir. 1963), affg. a Memorandum Opinion of this Court; Portland Manufacturing Co. v. Commissioner,56 T.C. 58 (1971), *330 affd. by unpublished opinion on another issue 35 AFTR 2d 75-1439, 75-1 USTC par. 9449 (9th Cir. 1975). Desmond's report contains the only evidence of the value of Gallo's assets. As previously indicated, we are quite skeptical of the asset values determined by Desmond. Indeed, even Desmond apparently gave little weight to his adjusted book value computation. As he stated at trial: But, the value could not be placed heavily, in light of the higher tangible net worth, merely because it was -- they were valuable assets. Those assets are worth what they'll earn. And, if they're not producing wine, those assets aren't worth anything at all. We need only consider asset value; we need not attribute any weight to it, if to do so would be unreasonable. As the Ninth Circuit Court of Appeals, to which this case is appealable (barring stipulation to the contrary), stated: [T]he statutory standard for evaluating closely held stock incorporates a number of alternative methods of valuation, and merely directs the trial court to consider all relevant methods. The applicable case law directs the trial court to consider all relevant information, but grants it broad discretion *331 in determining what method of valuation most fairly represents the fair market value of the stock in issue in light of the facts presented at trial. In light of * * * the wide discretion given the trial court to weigh the credibility of witnesses at trial and to determine the appropriate weight to give various methods of valuation, we do not believe the Tax Court erred in its choice of a method other than net asset value. [Citations omitted.] [Estate of O'Connell v. Commissioner,640 F.2d 249, 251-252 (9th Cir. 1981), affg. a Memorandum Opinion of this Court.] Considering the entire record, we do not believe that the value of Gallo's assets justified a higher valuation for the Dry Creek stock than that determined by Lehman Brothers. In sum, respondent's objections are unsupported by any evidence from which we could conclude that the methods and calculations used by Lehman Brothers were incorrect. Respondent is, in effect, merely asking us to substitute numbers that would achieve a higher valuation and to reject Lehman Brothers' approach because it produced a relatively low valuation. If we were to do so, we would be merely substituting our guess for *332 the expert opinion, when the original purpose of the expert opinion is to provide us with the assistance of persons specially qualified in the areas in issue. Discount for Lack of Marketability
Both parties agree that the fair market value of 1,178 shares of Dry Creek Class J common was less than the publicly traded value of the stock. The only issue is the proper amount of the discount to reflect the absence of a public market for the stock. Desmond concluded in his report that a relatively low discount of 10 percent was appropriate, primarily for the following reasons: 1. The popularity and opportunity associated with the wine industry during this period (as reflected by the multitude of acquisitions that took place). 2. Gallo's dominant position within the industry. 3. Ernest and Julio Gallo's unique value to the company's operations, which could enhance the possibility of a merger, acquisition or public offering, due to their respective ages. Desmond testified at trial that, because of the above factors, a sophisticated and well-financed investor might consider the purchase of the 1,178 Class J shares an opportunity to establish a position from which he *333 could later acquire a larger, perhaps controlling, interest in Dry Creek. Desmond believed that the hypothetical investor could not reasonably foresee a public market for the stock but would instead make the purchase "[j]ust to get on the inside to see what * * * [he] could see." We have found as facts that Dry Creek intended to remain closely held by the Gallo family and that none of the common shareholders intended to sell any shares to outsiders, as of the valuation date. These findings were supported by substantial evidence, including the extensive and uncontradicted testimony by two members of the second generation of Gallos. A rational investor would not assume that the purchase of the 1,178 Class J shares would lead to the acquisition of a larger interest in Dry Creek. [8]
*334 The hypothetical purchaser would acquire only a very small interest in a family-dominated corporation, for which there existed no ready market and little reasonable expectation for significant dividend income. [9] Dry Creek's capital structure and voting provisions, which required a majority vote of both classes of common shares for shareholder action, exacerbated the problems facing an outside investor in Dry Creek. Citing Luce v. United States,4 Cl. Ct. 212 (1983), respondent implies in his brief that we should presume the purchaser of the 1,178 Class J shares to be a member of the Gallo family.[10] Respondent is desperately reaching for some support for the unsupportable. As respondent admits, such a presumption would be inconsistent with the holding of Estate of Bright v. United States,658 F.2d 999 (5th Cir. 1981) *335 (en banc), expressly adopted by both the Ninth Circuit Court of Appeals and this Court. See Propstra v. United States,680 F.2d 1248, 1251-1253 (9th Cir. 1982); Estate of Andrews v. Commissioner,79 T.C. 938, 953-956 (1982). See also Estate of Lee v. Commissioner,69 T.C. 860 (1978). For our purposes, the assumed purchaser of the shares in issue must be hypothetical, not a Gallo family member. Respondent further argues that a published empirical study, considered by both Desmond and petitioner's experts, supports the 10 percent discount determined by Desmond. The study relied upon by respondent concerned discounts applicable to restricted stock of publicly traded companies. Although such shares were typically issued in private placements and were not immediately tradeable, a purchaser of the shares could reasonably expect them to be publicly traded in the future. The purchaser of Dry Creek shares, by contrast, could foresee no reasonable *336 prospect of his shares becoming freely traded. We thus reject Desmond's 10 percent discount figure as too low. Considering the entire record, we believe that the 36 percent figure determined by Lehman Brothers, which was substantially equal to that used by Cadenasso, was a reasonable discount to reflect the illiquidity of the 1,178 Class J shares. Although Pratt concluded that 50 percent was an appropriate discount, we believe that the conclusions of Cadenasso and Lehman Brothers, as integral portions of comprehensive analyses, were more reliable in the present case. Conclusion
As permitted under section 6512(b), we find that petitioner made an overpayment in decedent's estate tax. Because the amount of the overpayment depends upon the credit for state death taxes paid, Decision will be entered under Rule 155.
Footnotes
1. By order of the Court, numerous portions of the record were sealed at petitioner's request. Because most of such confidential evidence consists of sensitive financial information relating to Gallo, we have, to the extent possible, minimized specific findings concerning Gallo's financial condition. We have nevertheless considered the entire record, and our general findings are consistent therewith.↩
2. Gallo maintained its financial records on the fiscal year ending August 31.↩
3. Desmond's approach differed from Lehman Brothers' in mechanical application. Instead of using the various ratios to value directly the common stock of Dry Creek (based upon per share financial data adjusted for the effects of Dry Creek preferred stock), Desmond used the ratios to value the total equity of Dry Creek (based upon aggregate unadjusted financial data). He then determined a single value for Dry Creek through a weighting process, described infra.↩ From this value he deducted the amount at which he valued the outstanding preferred stock.
4. The price-earnings ratio assigned to Gallo by Desmond exceeded the ratio determined by Lehman Brothers by approximately 29 percent. The equivalence in ultimate common stock values reflects that Desmond valued the preferred stock at greater than liquidating value. See supra↩ note 3.
5. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect on the valuation date.↩
6. Neither petitioner nor respondent attributes any significance to the sales between the trusts for decedent.↩
7. A different problem may arise where the expert is called upon to vindicate an opinion that was the original basis for the transaction in dispute. See Chiu v. Commissioner,84 T.C. 722↩ (1985).
8. Desmond stated at trial: I know that Gallo management itself made it very clear to me, and they reiterated it here on the stand here yesterday, that there was no discussion, other than in 1972 no interest in selling stock. Well, the assignment here * * * is the assumption -- it may be hypothetical, but that's what I'm saddled with -- that there is a willing seller, not just a willing buyer. Our task is to value the 1,178 Class J shares. It is only for these shares that we must visualize a willing buyer and a willing seller. No prospective purchaser of the 1,178 shares would, like Desmond, ignore the stated intention of the Gallo family members.↩
9. Cf. Estate of Katz v. Commissioner,T.C. Memo. 1968-171↩.None of the experts concluded that the size of the block of shares in issue, standing alone, justified a discount from the publicly traded value of the shares. Like the experts, we have considered the relatively small interest represented by the block only as it affected the discount for illiquidity.
10. Desmond's report contained a similar implication, but he stated at trial that he did not consider, in his valuation, the possibility that Gallo family members might purchase the stock.↩